[Civ. No. 42545. First Dist., Div. Four. July 27, 1979.]

WAYNE MINNICK et al., Plaintiffs and Respondents, v.
DEPARTMENT OF CORRECTIONS et al.,
Defendants and Appellants.

508

COUNSEL

Howard, Prim, Rice, Nemerovski, Canady & Pollak, Stuart R. Pollak, Jerome B. Falk, Jr., Steven L. Mayer, Steven E. Schon, Fred H. Altshuler and Constance Henderson for Defendants and Appellants.

Thomas A. Seaton and Mark N. Aaronson as Amici Curiae on behalf of Defendants and Appellants.

Carroll, Burdick & McDonough, Ronald Yank and Christopher D. Burdick for Plaintiffs and Respondents.

OPINION

**RATTIGAN, J.**—The California Department of Corrections and Jero J. Enomoto, its director, appeal from a declaratory judgment which states that they have violated specified constitutional and statutory provisions "by discriminating by reason of sex and by reason of ethnic background in hiring and promotion of employees" in the department. The judgment also orders, and the court issued, a "Permanent Injunction" restraining the department and Enomoto from engaging in certain personnel practices in the future.

The judgment was entered after a nonjury trial of the issues joined on an amended complaint filed by respondents Wayne Minnick, Henry J. Darden, and California Correctional Officers Association (CCOA) in 1976. Because of material changes in the direction and reach of respondents' action after that, the judgment grants only part of the relief they initially sought. It also reflects an application of the California Supreme Court's 1976 decision in the celebrated *Bakke* case. (*Bakke* v. *Regents of the University of California* (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152].) That decision (hereinafter cited as *California Bakke*) has been substantially superseded by the United States Supreme Court's resolution of the same case during the pendency of this appeal. (*University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733] [*U.S. Bakke*].) These chronological factors, and other problems, require that the extensive record be summarized in close detail.

*The Pleadings*

Respondents Minnick and Darden are male Caucasians employed by the department as correctional officers in the state prison system. They are also members of the CCOA, a statewide organization. These facts, and the identities of the various defendants, were alleged in the amended complaint filed in 1976. The defendants named in it included the department and Enomoto, who was sued in his representative capacity as its director.[1]

In each of four counts pleaded in the amended complaint, respondents made conventional allegations to the general effect that Minnick and Darden were entitled to maintain the action as a class action "on behalf of themselves and on behalf of all other employees of the Department of Corrections, insofar as such employees are disadvantaged and/or find themselves judged with regard to hiring and promotional policies on the basis of their sex and/or race."

As pertinent here, it was further alleged in each count that the named defendants (see fn. 1, *ante*) had "discriminated" against Minnick, Darden, and other employees of the department "on the grounds of race, national origin, and sex," in the "carrying-out" of a so-called "Affirmative Action Program"; that specified aspects of the program were not being "contested" by respondents, but that its operation had caused discriminatory treatment of Minnick and Darden in described episodes in which each had been denied promotion in his employment by reason of his race and sex and "the race and/or sex of the person actually promoted" in preference to him; that each had exhausted his administrative remedies; and that CCOA had been "damaged" by the described employment practices because they frustrated its objectives as "an organization actively opposed to racism and sexism, and working actively to increase the unity of all correctional officers . . . ." It was alleged in a perorative paragraph that Minnick and Darden had been and will continue to be "denied promotional employment opportunities . . . on the basis of their race and/or the basis of their sex" in violation of the Fourteenth Amendment of the United States Constitution, sections 7 and 8 of article I of the California Constitution, and various federal and California statutes.

---

[1]The defendants named in the amended complaint also included Carlos Sanchez, who was similarly sued in his capacity as assistant director of the department; the State Personnel Board; and the "State of California" as such. These parties later disappeared from the action under circumstances which need not be described, leaving the department and Enomoto as the sole defendants and appellants.

According to the fair import of the allegations in the various counts, and of multiple prayers which followed them, Minnick and Darden sought mandatory injunctions requiring their promotions and the recovery of damages in the form of back pay for the higher positions allegedly denied them. According to the same sources, all three respondents sought an award of attorneys' fees alleged as "damages" they had incurred; preliminary and permanent injunctions restraining the defendants from further carrying out the discriminatory personnel policies alleged; and a declaratory judgment to the effect that the policies were "unconstitutional, illegal, and void."

In an answer filed in 1976 by the defendants then named in the action (see fn. 1, *ante*), they pleaded material admissions and denials and several affirmative defenses.

### The Trial

Respondents obtained an "Order To Show Cause Re Preliminary Injunction" which was set for hearing in early 1976 but ordered off calendar to permit discovery proceedings. The parties later stipulated that a rescheduled hearing on it would serve as a trial of the action and that jury trial was waived. Pursuant to a bifurcation agreed upon still later, the issues of "liability" (as distinguished from "damages") were tried first. The cause was tried on these bases between August and October of 1976.

### The Evidence

Testimony from more than 30 witnesses, and 58 documentary exhibits, were received at the trial. The voluminous briefs argue the consequent mass of evidence in terms of what it shows, but neither side had adequately summarized it. The record supports the following recitals, which will suffice for purposes of this appeal:

The department adopted a documented "Affirmative Action Plan" (hereinafter AAP) in 1974. Its preamble states in pertinent part that the department's "policy" is "to provide equal employment opportunities for all persons on the basis of merit and fitness and to prohibit discrimination based on race, sex, color, religion, national origin, or ancestry in every aspect of personnel policy and practices in the employment . . . and treatment of employees." According to its terms, the principal objectives of the AAP include (1) increasing the number of female employees in the department to a percentage level equivalent with that in the total

"California labor force" in April 1970, and (2) increasing the number of "minority" employees to a level equalling at least 70 percent of any given "minority" in the inmate population of the department (i.e., state prisoners).

The projected increases were variously broken down and allocated among segments of the department and specified ethnic "minority" groups (defined as "Black," "Asian," "Spanish surname," "Native American," and "other extraction"), but they respectively translated into "overall" goals of "38% women employed" and "36% minorities employed." There was evidence that the attainment of these goals would serve inmate-related objectives of the department by improving relationships with prisoners and reducing severe racial conflict and violence within the state prison system.

The percentages of female and minority employees in the department were markedly below those projected in the AAP when it was adopted. The attainment of both percentages was targeted to be reached by July 1979. Although their realization was consequently directed to the hiring of new female and minority employees, the AAP provided that the underlying policy of nondiscrimination was to be applied in all areas involving the promotion, transfer, training, and work assignments of department personnel.

There was evidence that various male Caucasian employees had been denied promotion or transfer in instances where preferences had been given to female or minority members. Proof presented by respondents Minnick and Darden supported the inference that each had been denied promotion in deference to a female or minority candidate, and it was shown that each had pursued a "grievance" to the State Personnel Board without success. It was also established, however, that neither had been eligible for promotion under conventional civil service rules which applied irrespective of the AAP or its implementation.

Various supervisory employees of the department testified that preference for promotion or transfer was *not* given to female or minority employees in specified segments of the department after 1974. There was thus a conflict in the evidence as to how widely the preferential policies expressed in the AAP had been pursued within the department. According to all the evidence of instances where they had been applied, "preference" was given to female sex or minority status only to the extent that each was considered a "plus" factor in the assessment of a particular

employee for promotion or transfer. Some evidence supported the inference that this "plus" had occasionally contributed to the promotion or transfer of the preferred employee ahead of nonpreferred candidates who were otherwise more qualified for the new position. There was no evidence that such "preference" had ever resulted in the promotion or transfer of an employee who was *not* qualified to hold the position.

Vacancies in specific positions were occasionally left open, and promotions or transfers to them were sometimes delayed, until qualified female or minority employees could be found to fill them. Some of these positions were labelled "female only," or with words similarly referring to sex (including "male only") or to race or ethnic background. There was no evidence that any specific number or percentage of positions were reserved for members of either sex or of any racial or ethnic group.

In response to an interrogatory, the department in effect denied that it had "wilfully, with a specific intent, engaged in illegal and/or improper discrimination against any person with regard to employment opportunities . . . on the basis of a person's race, color, creed, sex or national origin." It added, " . . . however, that as a result of its past hiring and promotion practices and procedures, there has been an adverse discriminatory impact on certain minorities and the female sex in terms of initial hiring and also promotion." This statement was the only substantial reference in the evidence to the effect that the department's personnel practices had discriminated against females and minorities in the "past." The exercise of "preference" in their favor in recent years, as described above, was limited to cases involving the promotion, transfer, or work assignment of employees only. There was no substantial evidence of any instance in which it had been exercised in the "initial hiring" of a new employee.

### Posttrial Proceedings

The cause was submitted on November 23, 1976. On January 5, 1977, the trial court filed a memorandum decision indicating its intention to grant injunctive relief to respondents, stating its reasons, and directing respondents to prepare an appropriate order and findings of fact and conclusions of law. Protracted proceedings followed, during 1977, before findings were settled and signed. The pertinent events were these:

On February 28, the court made an order granting and issuing the equivalent of an injunction pendente lite which restrained the depart-

ment and Enomoto from performing any act of "hiring or promoting any employee in the Department . . . in which preference is given to race, color, sex, or national origin until the further order of this court."[2]

In April, the department and Enomoto moved for an "order augmenting the record" to include a massive array of sworn declarations and other documents for the purpose of showing that the AAP had been "designed to rectify" past personnel practices which had operated to discriminate on racial and other grounds.[3] The motion was orally denied at a hearing conducted on May 5.

In June, respondents moved for an order certifying their action as a class action. At a hearing on this motion in July, the court indicated its view that respondents Minnick and Darden were not entitled to damages, nor to maintain a class action for damages because they had not shown that they had been denied promotion by reason of the discriminatory personnel practices alleged. The court nevertheless stated that it had perceived such practices to exist, and that it desired to grant declaratory and injunctive relief against them. A discussion followed as to whether Minnick, Darden and CCOA still had "standing" to obtain that relief in the action. The court accepted a stipulation that they did, denied the motion for certification, and ruled "money damages" out of the case.[4] On August 2, the court made formal orders denying the motion for certification and the department's and Enomoto's motion for an order augmenting the record.

### The Findings and Judgment

The thus-narrowed issues in the action were resolved in the findings of fact and conclusions of law, which were settled after lengthy hearings.

[2]The department and Enomoto joined in an appeal taken from this order on March 4. That appeal was never perfected, and the briefs on this one do not mention it. For these reasons, and for recordkeeping purposes, we hereinafter dismiss it.

[3]Respondents moved "in the alternative" for an order "reopening the case for further evidence of the past discriminatory practices which the . . . Affirmative Action Plan was designed to rectify." On the alternative motion, the accompanying declarations and other documents were presented as an offer of proof.

[4]The court stated in these respects as follows: "Then it's stipulated or conceded that the individual plaintiffs in this action [Minnick and Darden] and the Association [CCOA] . . . have standing in this action, and that the court has *jurisdiction* in the matter to the extent that if the testimony and evidence will support it, to grant injunctive relief that would preclude the Department from in any manner, shape, or form, discriminating against or in favor of anyone in that Department by reason of race, color, place of origin, sex, and so on. . . . *I will make a ruling that I'll not grant you your motion to consider this a class action, and I will deny your seeking monetary damages.*" (Italics added.)

The trial court signed and filed them on October 11, 1977. The declaratory judgment and the "Permanent Injunction" were entered the next day.

The pertinent findings (Nos. 8, 10, 13, 16 and 19) are quoted in the margin.[5] Two of the conclusions of law were substantially copied into paragraphs of the judgment which read as follows:

"1. Defendants . . . Department . . . and . . . Enomoto, by discriminating by reason of sex and by reason of ethnic background in hiring and promotion of employees . . . , have violated and are continuing to violate [1] the Fourteenth Amendment to the United States Constitution, [2] Article I, Sections 7 and 8 of the California Constitution, [3] Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq., [4] 42 U.S.C. §§ 1981 and 1983, [5] California Labor Code § 1410 et seq., and [6] California Government Code § 50084.

" . . . . . . . . . . . . . . . . .

---

[5]"8. Defendants Department . . . and Jeri J. Enomoto have discriminated and are continuing to discriminate by reason of sex and by reason of ethnic background in hiring and promotion of employees in the Department. In so doing, the defendants were motivated at least in part by . . . [the] . . . Affirmative Action Plan . . . . In so doing, preferences result in favor of certain ethnic groups, or in favor of one sex to the detriment of the other, and not *solely* on the qualifications of the individuals involved, or their merits." (Italics added.)

"10. All employees of the Department, including the plaintiff[s] . . . Minnick and . . . Darden, have been discriminated against by reason of their race."

"13. There has been long standing discrimination against minorities and women by our society. However, the acts complained of in . . . [this] . . . action are not justified by, nor do they remedy, past wrongs by society against any such minorities or women. Furthermore, the acts complained of, and more particularly described in these Findings of Fact and Conclusions of Law, operate to the detriment of innocent employees of the Department who played no role in any previous discrimination by portions of our society."

"16. Defendants have no scientific or objective basis whatsoever by which they classify people into one racial category or another, for purposes of granting preferences or imposing detriments concerning job opportunities with defendants. Defendants have no dispute-resolution procedure by which a person seeking to be placed in one category, instead of another, can complain, or by which a person complaining of the categorization of another person may complain."

"19. The unique and sensitive nature of the functions of the Department . . . and the peculiar difficulties inherent in the administration of California's prison system require the Department to exercise broad discretion in making job assignments and in determining the employment responsibilities of its employees. Because of the conditions and circumstances within California prisons and throughout the Department . . . , it is necessary for the Department to consider, among other factors, the composition of the existing work force and of the inmate population, and the race and sex of employees, in order to serve the *compelling state interest* in promoting the safety of correctional officers and inmates, encouraging inmate rehabilitation, minimizing racial tensions, and furthering orderly and efficient prison management." (Italics added.)

"3. Defendants . . . , by engaging in employment practices above-described and by the arbitrary and capricious nature of the racial categorization process (as particularly described in the Findings of Fact and Conclusions of Law) utilized by said defendants, have deprived and are continuing to deprive employees in the Department . . . of substantive and procedural due process of law within the meaning of both the Fourteenth Amendment to the United States Constitution and within the meaning of Article I, Section 7 of the California Constitution."[6]

In a trailing provision of the judgment, the court ordered that "[a] Permanent Injunction attached hereto, marked Exhibit 'A' and incorporated herein by reference, be issued in this case." The "Permanent Injunction" was thereupon signed and issued by the court, and entered on October 12, 1977, as a separate document.[7]

## The Appeal

The department and Enomoto filed a notice of appeal on October 14, 1977, stating that they appeal from the judgment and the "Permanent Injunction." They subsequently petitioned this court for a writ of supersedeas. We granted the petition and entered an order staying enforcement of the judgment and the "Permanent Injunction" pending determination of the appeal.

## REVIEW

### Paragraph 1 of the Judgment

This paragraph is to be reviewed, separately, in light of the successive constitutional and statutory provisions it declares the department and

---

[6]The constitutional and statutory provisions cited in paragraph 1 (which is here quoted with some corrective editing and our numbers added) were those cited in respondents' amended complaint as later amended again. Paragraphs 1 and 3 of the judgment incorporated the substance of the trial court's conclusions of law Nos. 2 and 3, respectively. Its conclusion of law No. 1 stated that "[p]laintiffs [respondents] are entitled to injunctive relief."

[7]The document is addressed to the department, Enomoto as its director, "their officers, agents, servants and employees, and all persons acting in concert with them." It opens with recitals which refer to the trial of the action and to "good cause appearing" for the following language: "IT IS HEREBY ORDERED that . . . [the addressees] . . . shall be, and they hereby are, enjoined and restrained from engaging in . . . any and all of the following acts: [¶] (1) From hiring or promoting any employee in the Department . . . in which [sic] preference, advantage, or benefit is given to race, color, sex, or national origin. [¶] (a) Provided, however, that nothing in this order shall prevent any person, in determining the assignments and job responsibilities of employees of the Department . . . , from considering, among other relevant factors, the race and sex of the employees in question. [¶] (b) Provided, however, 'male only,' 'female only,' and bi-lingual certifications may be requested and/or granted when the job-related aspect of the certification can be objectively and demonstrably shown and established. . . ."

Enomoto to have "violated." (See the judgment as quoted in the text at fn. 6, *ante.*)

*The Equal Protection Clause
of the Fourteenth Amendment*

 Although the first citation in paragraph 1 refers only to "the Fourteenth Amendment to the United States Constitution," it is undisputed that the reference is to the equal protection clause.[8] The *Bakke* litigation and its overlapping chronology are pertinent for this reason. The California Supreme Court decided *Bakke* on September 16, 1976 (*California Bakke, supra,* 18 Cal.3d at p. 34), during the trial of this case and a full year before it was decided in 1977. The superseding decision of the United States Supreme Court emerged on June 28, 1978 (*U.S. Bakke, supra,* 438 U.S. at p. 265), several months after this appeal was taken.

Both decisions require discussion, but neither of them need be analyzed at length. Both courts ordered the plaintiff admitted to a medical school operated by the University of California after he had successfully challenged its "special admission program." (*California Bakke, supra,* 18 Cal.3d at pp. 63-64; *U.S. Bakke, supra,* 438 U.S. at pp. 281, 320 [57 L.Ed.2d at pp. 765, 790].) A formula employed in the program effectively limited eligibility for 16 student seats at the school (out of 100) to applicants who were members of specified racial or ethnic minorities. (*U.S. Bakke, supra,* 438 U.S. at pp. 273-275 [57 L.Ed.2d at pp. 759-761].)

The California Supreme Court held that a "strict scrutiny" test was to be applied because of the racial classification thus effected (*California Bakke, supra,* 18 Cal.3d at pp. 49-50), found from its application that the program violated the equal protection clause because the rigid and exclusive racial quotas employed in it served no compelling governmental interest not obtainable by less intrusive means (*id.,* at pp. 52-62), and produced a result which we may treat in two parts. Part 1 declared the program unconstitutional under the equal protection clause. (*Id.,* at pp. 62-63.) Part 2 effectively enjoined the university from giving *any* consideration to the race of an applicant seeking admission to the medical

---

[8]The clause appears in its context as follows: ". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the *equal protection of the laws.*" (U.S. Const., 14th Amend., § 1 [italics added].)

school. (See *id.,* at pp. 55, 61-63; *U.S. Bakke, supra,* 438 U.S. at pp. 279, 320 [57 L.Ed.2d at pp. 764, 790].)

In reviewing parts 1 and 2, all nine members of the United States Supreme Court substantially agreed that the racial classification in the program was "suspect" for equal protection purposes and that the "strict scrutiny" test was accordingly to be applied in determining whether the program served a compelling governmental interest. (*U.S. Bakke, supra,* 438 U.S. at pp. 287-305, 355-362 [57 L.Ed.2d at pp. 769-781, 812-816].) Five members thereupon joined in affirming part 1. (*Id.,* at pp. 271, 319-320 [57 L.Ed.2d at pp. 759, 789-790].) One of these five (Justice Powell) joined four other members in a net result which reversed part 2. (*Id.,* at pp. 272, 320, 325-326, 379 [57 L.Ed.2d at pp. 759, 790, 792-793, 827].)

The present trial court had meanwhile followed the all-inclusive proscription of part 2 when it found and declared, in 1977, that the department and Enomoto had "violated" the equal protection clause by extending "preferences" to employees based on race or sex. (See finding No. 8 in fn. 5, *ante.*) Its application of part 2 at that time was entirely proper, but the question now is whether the declaration may stand in light of *U.S. Bakke.* We hold that it cannot.

Justice Powell's opinion in *U.S. Bakke* establishes the reasoning and guidelines under which consideration may be given to the race or ethnic background of an applicant for admission to a state-operated *school* reached by the Fourteenth Amendment. (See *U.S. Bakke, supra,* 438 U.S. at p. 287 [57 L.Ed.2d at p. 769].) Such consideration is permitted by the equal protection clause because it is necessary to promote the "compelling" interest of the state in attaining "ethnic diversity" among the school's students. (*Id.,* at pp. 311-315 [57 L.Ed.2d at pp. 784-787].) The clause nevertheless requires a school pursuing that objective to do it in such way that (1) " . . . race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet . . . does not insulate the individual from comparison with all other candidates for the available seats"; and (2) a candidate not credited with that "plus" will be "fairly and competitively" evaluated for all the seats without being "totally excluded from a specific percentage" of them which has been restricted to a particular racial or ethnic group. (*Id.,* at pp. 316-319 [57 L.Ed.2d at pp. 787-789].)

This language closely fits the department's personnel practices challenged here. ▇ In its finding No. 19, the trial court effectively

determined that the practices apply the prison-related realities of race and sex to the point of promoting a "compelling state interest" in a safe and efficient correctional system. (See fn. 5, *ante.*) The finding is supported by the evidence. ■ The "interest" mentioned in it lacks the constitutional basis of the University of California's interest in attaining "ethnic diversity" among its students (see *U.S. Bakke, supra,* 438 U.S. 265 at p. 313 [57 L.Ed.2d 750 at p. 785]), but safety and efficiency in the prisons of the same state are no less "compelling." The department is pursuing those objectives by assigning a female or minority employee a "plus" in competition for promotion or transfer. The qualifications of other employees in the competition are still "weighed fairly and competitively." (See *id.,* at pp. 317-318 [57 L.Ed.2d 750 at pp. 788-789].)

The department's AAP refers to the realization of "38% women employed" and "36% minorities employed" within five years. This language sounds in "quota" terms, but neither percentage figure bespeaks a "quota" of the type proscribed in Justice Powell's opinion in *U.S. Bakke.* Each is an optimum "quota" to the extent that it defines a goal to be attained in the future. Neither is a functional "quota" which now operates to place either—or any—percentage of positions in the department beyond the reach of male or nonminority employees. (Compare *U.S. Bakke, supra,* 438 U.S. 265 at pp. 275, 319 [57 L.Ed.2d 750 at pp. 761, 789].) The distinction was recognized in finding No. 19, where the trial court found partial *motivation* for the department's practices in the AAP but *discrimination* in the practices alone. (See fn. 5, *ante.*) The "Permanent Injunction" restrains certain aspects of the practices but not the implementation of the AAP as such. (See fn. 7.)

The terminal question is whether this record supports the declaration, in paragraph 1 of the judgment, that the department and Enomoto violated the equal protection clause by "discriminating" on the bases of race and sex in the "hiring and promotion of employees." The declaration rests on the trial court's finding (No. 8) that they had "discriminated" in those respects by applying personnel practices from which "preferences result in favor of certain ethnic groups or . . . of one sex." (See fn. 5, *ante.*) According to our review of the evidence, it does not support a finding that "preferences result" from the practices in favor of males or in the "hiring" of employees. Finding No. 8 therefore fails to support the declaration in either respect.

The practices otherwise identified in the finding have just been examined in light of *U.S. Bakke* and under the "strict scrutiny" it

commands. We conclude that they are permitted by the equal protection clause within the limited extent that noncontrolling "preferences result in favor of certain ethnic groups" for purposes of promotion or transfer of personnel within the department, because they are necessary to promote the compelling interest of this state in the proper management of its correctional system. For the same reasons, they are permitted insofar as the same limited "preferences result" in favor of women. Finding No. 8 accordingly fails to support the declaration that the department and Enomoto violated the equal protection clause in any respect.

We move to other constitutional and statutory violations charged in paragraph 1 of the judgment. We preliminarily observe from the record that the trial court placed almost exclusive emphasis on the violation of the equal protection clause it declared first, and that the others trailed it into paragraph 1 in the form of little more than an omnibus recital. We may examine them more briefly for that reason.

### The California Constitution

■ The court further declares in paragraph 1 that the department and Enomoto, "by discriminating . . . ," have violated article I, sections 7 and 8, of the California Constitution.[9] Again, the record demonstrates that the reference to section 7 is to its equal protection language alone. (See fn. 9, *ante.*) The reference excludes the declaration from the reach of *U.S. Bakke* because the constitutional issues raised in that case were decided under the corresponding provisions of the Fourteenth Amendment. (*U.S. Bakke, supra,* 438 U.S. 265 at pp. 271, 320 [57 L.Ed.2d 750 at pp. 759, 790].)

■ Decisions of the United States Supreme Court defining "fundamental civil rights" under the federal Constitution "are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law." (*People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].)

---

[9]These sections respectively provide: "7. (a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws.

"(b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. Privileges or immunities granted by the Legislature may be altered or revoked.

"8. A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin."

■ Respondents have asserted "fundamental civil rights" in this action, but we are not persuaded that the rationale of *U.S. Bakke* provides them with "less individual protection than is guaranteed by California law." Under that rationale, the evidence does not support the declaration that section 7 of article I has been violated.

■ Section 8 of article I does not parallel a literally equivalent provision in the federal Constitution. Respondents Minnick and Darden, and other employees of the department who claim to be disaffected by its preferential personnel practices, are "pursuing . . . employment" within the meaning of section 8. (See fn. 9, *ante.*) The limited "preferences" given to certain employees, for purposes of promotion and transfer, are based on "race" and "sex" within the same meaning. The "preferences" do not exclude others from eligibility for promotion or transfer, nor from having their own qualifications "weighed fairly and competitively" in the process. (See *U.S. Bakke, supra,* 438 U.S. 265 at pp. 317-318 [57 L.Ed.2d 750 at p. 788].) None of them is "disqualified" in any respect within the meaning of section 8. The evidence does not support the declaration that the section has been violated.

### Federal Statutes

■ It is further declared in paragraph 1 of the judgment that the department and Enomoto, "by discriminating . . . ," have violated federal statutes cited as "Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)" and "42 U.S.C. §§ 1981 and 1983." As amended, title VII of the Civil Rights Act of 1964 effectively prohibits discrimination by an "employer," in any area of nonexcepted employment (see 42 U.S.C. § 2000e-1), on the basis of an "individual's race, color, religion, sex, or national origin." (*Id.,* § 2000e-2(a).) The prohibition reaches the department, a public employer, as well as private employers. (*Id.,* § 2000e(a), (b); *Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 331-332, fn. 14 [53 L.Ed.2d 786, 798-799, 97 S.Ct. 2720].)

*U.S. Bakke* did not involve title VII as such, but a clear majority of the United States Supreme Court has since held, on the basis of the congressional intent underlying the title, that it does not prohibit *private* employers from voluntarily adopting "race-conscious affirmative action plans." (*Steelworkers* v. *Weber* (1979) 443 U.S. 193, 202-208 [61 L.Ed.2d 480, 488-492, 99 S.Ct. 2721, 2727-2730].) The department has done precisely that, and the trial court found from substantial evidence that the plan it adopted had partially "motivated" the personnel practices challenged in this section. (See finding No. 8, quoted in fn. 5, *ante.*) The fact that the department is a public employer

suggests no basis for excluding it from the reach of the congressional intent and objectives analyzed in *Steelworkers.* We accordingly perceive no violation of title VII in the practices the department's AAP has "motivated." The contrary declaration in paragraph 1 of the judgment is erroneous.

■ "42 U.S.C. §§ 1981 and 1983" are vintage statutes which operate to guarantee a civil remedy for violations of the Fourteenth Amendment. (See *Monroe* v. *Pape* (1961) 365 U.S. 167, 170-172 [5 L.Ed.2d 492, 496-497, 81 S.Ct. 473]; *Rizzo* v. *Goode* (1976) 423 U.S. 362, 370-371 [46 L.Ed.2d 561, 568-570, 96 S.Ct. 598].) They have no application here. The declaration that the department and Enomoto "violated" either of them is erroneous.

*State Statutes*

■ Paragraph 1 declares violations of "California Labor Code § 1410 et seq." (the California Fair Employment Practices Act) and "Government Code § 50084." Respondents state that they "agree" that these statutes "provide no greater legal bases for stating a cause of action than do the Equal Protection Clauses of the United States and California Constitutions and Title VII of the Civil Rights Act of 1964." Our disposition of the points raised on these various sources therefore disposes of this one. Government Code section 50084 is inapplicable for the additional reason that it requires the employment practices of a "local agency" to conform to the Civil Rights Act of 1964. Neither the department nor Enomoto is a "local agency" for purposes of this statute. (See Gov. Code, § 50001.)

*Paragraph 3 of the Judgment*

■ This paragraph declares that the department and Enomoto have deprived employees in the department "of substantive and procedural due process of law within the meaning of both the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution." The reference unmistakably cites the due process clauses of both sources. (See fns. 8 and 9, *ante.*) The declaration rests on the trial court's finding No. 16 (quoted in fn. 5), relative to procedural deficiencies involving the department's classification of employees by race and their opportunity to challenge a racial classification by way of administrative review. (See *ibid.*)

The deficiencies found were not challenged by respondents in this action. Finding No. 16 was made, at the trial court's insistence, after it had been shown that racial classifications were made on the basis of

employees' surnames. The reference in the declaration to the "arbitrary and capricious nature" of this procedure derives from observations in the record that the identification of race by surname is somewhat casual and very possibly inaccurate (e.g., in identifying the race of a woman married to a husband with an Asian surname). The observations are valid, but the finding and declaration are not. There is no evidence showing that the asserted deficiencies have ever produced an erroneous racial classification *in fact,* nor that any person has been aggrieved by them *in fact.* If the evidence dimly supports finding No. 16, the finding itself does not support the declaration that anyone has been denied due process of law. The declaration is accordingly erroneous.

The declarations in paragraphs 1 and 3 of the judgment are thus unsupported by the record. Its other provisions are strictly ancillary to those paragraphs. We reverse it accordingly.

### The "Permanent Injunction"

Although the issuance of this injunction was expressly ordered in the trailing provision of the judgment quoted above, it emerged as a separate document in a format reciting "good cause" for its injunctive language. (See fn. 7, *ante.*) These factors make it independently appealable as an "order granting . . . an injunction" (Code Civ. Proc., § 904.1, subd. (f)), but it will not stand by itself. Although the exceptions stated in it ("Provided, however") appear to make allowance for recognition of employees' race and sex in the department's work assignments, its express injunction against giving "advantage" or "benefit" to race or sex would prohibit the competitive "plus" now given to some female or minority employees under consideration for promotion or transfer. Because *U.S. Bakke* permits the "plus," the injunctive language is overbroad in itself.

It is also based on the trial court's conclusion of law that respondents were "entitled to injunctive relief" against the personnel practices deemed to have "violated" the law as declared in the other conclusions of law and in the judgment. (See fn. 6, *ante.*) Because we have now held that they have not "violated" the law, the injunction must fall with the judgment. We reverse it.

### The Motion to Augment or Reopen

The department and Enomoto made this motion, five months after the case had been submitted for decision, for the purpose of proving past discrimination by the department on the bases of race and sex. (See the text at fn. 2, *ante.*) In ordering it denied, the trial court remarked that

it was "irrelevant." That characterization was not given it in the formal order denying it, but the reasons the court deemed it "irrelevant" were later stated in finding No. 13. (See fn. 5.)

The court did not abuse its discretion in denying the motion, which was made by afterthought and much too late. We need not decide the relevance of the evidence offered, nor the validity of finding No. 16. If the case is to be retried, Justice Powell's decision in *U.S. Bakke* will be pertinent to the determination of either question. (See *U.S. Bakke, supra,* 438 U.S. 265 at pp. 307-310 [57 L.Ed.2d 750 at pp. 782-784].)

*Respondents' "Standing"*

There is no claim of error in this regard, but we perceive problems with respondents' "standing" which will recur if the case is to be retried. The problems appeared when they moved for an order certifying their action as a class action after it had been recognized that respondents Minnick and Darden were not entitled to damages or injunctive relief as individuals. The motion was denied when the parties stipulated that all three respondents had "standing" to obtain declaratory relief, and that the trial court had "jurisdiction" to grant it. (See fn. 4, *ante.*)

Although respondents were not permitted to proceed in a class action, the results had the dimensions of class relief. There is a real question whether Minnick and Darden may act as representatives of other employees if they are not entitled to relief as individuals. Another question is whether all employees in the department may be represented by the CCOA, whose membership is apparently limited to correctional officers only. If their "standing" to proceed with the litigation could be conferred by stipulation, the trial court's *jurisdiction* could not. (1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 10, pp. 534-536.) These problems require examination if the case is to be retried.

The appeal purportedly taken on March 4, 1977, is dismissed. The "Judgment And Declaratory Judgment" and the "Permanent Injunction" entered on October 12, 1977, are reversed. The stay order made by this court on November 4, 1977, is vacated.

Caldecott, P. J., and Christian, J., concurred.

A petition for a rehearing was denied August 23, 1979, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied November 8, 1979. Mosk, J., was of the opinion that the petition should be granted.