Kenneth BAKER, Arthur Bartniczak, Hanson Bratton, Patrick Jordan, Frank Krezowik, Elbert McVay and Robert Scally, Plaintiffs,

and

Hanson Bratton, Gale Bogenn, William Shell, Patrick Jordan, Charles Mahoney, Individually and on behalf of all others similarly situated and The Detroit Police Lieutenants & Sergeants Association, Plaintiffs,

v.

CITY OF DETROIT, a Municipal corporation; Philip G. Tannian, Chief of Police; Coleman A. Young, Mayor, City of Detroit; and The Board of Police Commissioners, City of Detroit, Defendants,

and

Guardians of Michigan, David L. Simmons, Arnold D. Payne, James E. Crawford, Clinton Donaldson, Willie Johnson, Kenneth M. Johnson and Alfred Brooks, Intervening Defendants.

Nos. 5–71937, 5–72264.

United States District Court, E. D. Michigan, S. D.

Nov. 17, 1980.

See also 483 F.Supp. 930.

James P. Hoffa, Murray J. Chodak, Hoffa, Chodak & Robiner, Detroit, Mich., for plaintiffs in No. 5–71937.

K. Preston Oade, Jr., Bernard A. Friedman, Robert S. Harrison, Marc G. Whitefield, Lippit, Harrison, Perlove, Friedman & Zack, Southfield, Mich., for plaintiffs in No. 5–72264.

Beth J. Lief, Jack Greenberg, James M. Nabrit, III, O. Peter Sherwood, Napoleon B. Williams, Lowell Johnston, New York City, Barry L. Goldstein, Washington, D. C., James R. Andary, Sp. Asst. Corp. Counsel for the City of Detroit, George Matish, Anna Diggs-Taylor, Nancy McCaughan, James Zeman, Denise Page Hood, Law Dept., City of Detroit, Detroit, Mich., for defendants.

Warren J. Bennia, New York City, for intervening defendants.

### FINAL OPINION

KEITH, Circuit Judge, Sitting by Designation.

This case concerns the affirmative action program of the Detroit Police Department. Numerous opinions of this Court have discussed the program at length. After a long trial this Court entered an extensive opinion on October 1, 1979, upholding the City's affirmative action program. The only caveat in this Court's opinion was that some form of end-date needed to be placed on the program. To that end, this Court requested that the Board of Police Commissioners meet and establish an end-date, which this Court would review for reasonableness. The Board has met and established an end-date, and both sides have moved for entry of a final order in this case. In addition, the City defendants have moved for costs, and the intervenors have moved for attorney's fees. Each of these issues was heard at oral argument on March 19, 1980. At the hearing, this Court reviewed the Board of Police Commissioner's actions, and concluded that the end-date was appropriate and reasonable. The Court requested that the parties draw up a final order, and submit it to the Court. The parties have been unable to agree on a final order. Because of this, and because this Court reserved a ruling on costs and attorney's fees, this Court herein sets out its final opinion and judgment.

### I.

In its October 1, 1979 opinion, this Court approved the City of Detroit's affirmative action program as it related to promotions from Sergeant to Lieutenant.[1]

---

1. This court denied a jury trial in this case on the grounds that actual and punitive damages were unavailable because the City had acted in good faith. *Baker v. City of Detroit*, 458 F.Supp. 379 (E.D.Mich.1978). At the time the jury trial issue was briefed and argued, neither *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) nor *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) had been decided. Plaintiffs were proceeding on the assumption that reverse discrimination suits present the same considerations that "ordinary" discrimination suits do. It is now clear, however, that such suits are very different.

In an "ordinary" discrimination case, the sue is whether an employer violated the law by intentionally discriminating against the plaintiff or by adopting hiring or promotions criteria which are not job-related but which adversely impacted against members of a minority group. *See e. g. Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In a "reverse" discrimination case, however, where an affirmative action plan is under attack, no such issues are presented. There is no question that affirmative action programs discriminate against whites in the sense that the opportunities of whites for hiring or advancement are less than they would otherwise be. The question in a "reverse" discrimination case is whether the affirmative action plan is a reasonable response to past discrimination. As Judge Lively, writing for the court, noted in *DPOA v. Young*, 608 F.2d 671, 697 (6th Cir. 1979):

*Bakke* and *Weber* make it clear that a case involving a claim of discrimination against members of the white majority is not a simple mirror image of a case involving claims of discrimination against minorities. One analysis is required when those for whose benefit the Constitution was amended or a statute enacted claim discrimination. A different analysis must be made when the claimants are not members of a class historically subjected to discrimination. When claims are brought by members of a group formerly subjected to discrimination the case moves with the grain of the Constitution and national policy. A suit which seeks to prevent public action designed to alleviate the effects of past discrimination moves against the grain, and the official actions complained of must be subjected to the analysis prescribed in *Weber* and the plurality opinion in *Bakke* which we find controlling.

The analysis to be done in a reverse discrimination case does not present any jury issues—only questions of law for a judge to decide. Only a judge can make the legal determination of whether an affirmative action program was a reasonable response to past discrimination. This case illustrates this proposition. Although there was a lengthy trial here, there were no disputed issues of fact which could have been submitted to a jury. The existence, operation and effect of the City of Detroit's affirmative action plan are a matter of record. There is simply no dispute as to when, how and why the Board of Police Commissioners operated the affirmative action plan. *See Baker v. City of Detroit*, 483 F.Supp. 919 (E.D.Mich. 1979).

This Court endorsed the City's 50/50 Black/White promotions formula. This Court further endorsed those affirmative action promotions which had taken place up until that time. Because the Board of Police Commissioners had not established an end-period to the affirmative action promotions, this Court requested that the Board do so. The Board convened on three separate occasions for the purpose of establishing a termination point to the affirmative action plan. Public hearings were held, and counsel for the plaintiffs actively participated. The Board adopted the following final resolution on December 20, 1979:

WHEREAS, the Board of Police Commissioners in July of 1974, made a finding in its public session that the Detroit Police Department had been guilty of unlawful racial discrimination in its hiring and promotional practices;

WHEREAS, the Board of Police Commissioners has received from the Department numerous documents and statistics that indicate the Department is still adversely affected by the effects of past discrimination;

WHEREAS, the Board of Police Commissioners has received from the Chief of Police a written presentation outlining the reasonable goals and objectives of the Affirmative Action Plan;

WHEREAS, the Board of Police Commissioners has received numerous exhibits and documents from the Chief of Police showing the continued drastic underrepresentation of Blacks at the rank of sergeant and lieutenant;

WHEREAS, the Board of Police Commissioners is convinced that in order to improve its operational effectiveness in crime prevention and solution, that the number of Blacks at the ranks of sergeant and lieutenant be increased;

WHEREAS, the Board of Police Commissioners has determined that the Affirmative Action Plan, as proposed by the Chief of Police, is substantially related to the objectives of remedying the effects of prior discrimination;

WHEREAS, the Board of Police Commissioners has received substantial evidence that the Affirmative Action Plan was substantially related to the objectives of improved law enforcement;

WHEREAS, the Board of Police Commissioners has determined that achieving the objectives of improved law enforcement; [sic]

WHEREAS, the Board of Police Commissioners has determined that achieving the objectives of remedying the effect of past discrimination require the implementation of a certain promotional ratio;

WHEREAS, the Board of Police Commissioners has received substantial evidence and statistics tending to show that a 50/50 promotional ratio will improve the law enforcement capability of the Detroit Police Department;

---

Nor was there any real dispute about past discrimination in the Detroit Police Department. The plaintiffs presented no countervailing evidence on this question. They only tried to blunt the defendant's presentation through cross-examination. Indeed, plaintiff's contention throughout was that any evidence as to past discrimination was irrelevant and inadmissible because they, as innocent parties, should not bear the brunt of affirmative action. Moreover, while this court did make extensive findings of fact concerning past discrimination in the Detroit Police Department, such findings are integral to the question of whether the City's affirmative action plan was reasonable. It is clear that there was no issue, even relating to past discrimination, which could have been presented to a jury. The issue in a reverse discrimination case is how much affirmative action is allowable in light of a history of past discrimination. It is for the judge—and not a jury—to decide whether past discrimination by the entity in question justifies the affirmative action program in question.

This court notes that in a recent case the Fifth Circuit reached a similar conclusion in a case where the plaintiff alleged that his due process rights had been violated. *Downing v. Williams*, 624 F.2d 612 (5th Cir. 1980). Judge Tuttle wrote:

While a jury can certainly determine contested issues of fact, it cannot make determination of law, such as whether [the plaintiff] "waived" his rights, or was provided "adequate" notice. These determinations of how constitutional standards are to be applied to the case at hand can only be made by the judge, since they are questions of law. *Downing, supra* at 617.

WHEREAS, the Board of Police Commissioners has concluded that a 50/50 ratio is the most reasonable method of achieving the goal in order to insure promotional opportunity to all persons in the Detroit Police Department to the ranks of sergeant and lieutenant;

WHEREAS, the Board of Police Commissioners has concluded that the 50/50 ratio is the most reasonable means available to correct the harsh effects of past discrimination;

WHEREAS, the Board of Police Commissioners has concluded that the 50/50 ratio serves to enhance public safety by improving law enforcement;

WHEREAS, the Board of Police Commissioners has been assured that all persons recommended for promotion to the ranks of sergeant and lieutenant are substantially equally qualified to perform the job for which they are being selected;

WHEREAS, the Board of Police Commissioners wishes to adopt and incorporate by reference the written presentation of all exhibits, documents, minutes of its meeting wherein it deliberated the promulgation and adoption of this Plan;

WHEREAS, the Board of Police Commissioners has determined that the program as described and the Chief's recommendations will achieve the objectives as provided for in the written presentation in as fair a manner as possible for all concerned;

WHEREAS, the Board of Police Commissioners determines at this time that an end-goal of 50% Black officers at the ranks of sergeant and lieutenant is appropriate in order to meet the objectives of the Affirmative Action Plan subject to a radical shift of the demographic composition of the City of Detroit or some other unforseen factor that markedly alters the circumstances;

WHEREAS, development of a job related, validated and race-neutral promotional model is essential to barring discrimination in the future and, therefore, to achieving a termination of the Affirmative Action Plan;

WHEREAS, the Board of Police Commissioners is of the opinion that a job related, validated and racially-neutral promotional model for promotions to the ranks of sergeant and lieutenant is essential to the proper functioning of the Department;

WHEREAS, the Board of Police Commissioners has received legal advice from its counsel that the Affirmative Action Plan is lawful;

WHEREAS, the Board of Police Commissioners has been informed that it is under a legal obligation to remedy the effects of the Department's prior unlawful practices; and

WHEREAS, the Board of Police Commissioners has been assured by its counsel that there are no existing legal impediments to the adoption of the Affirmative Action Plan as described.

THEREFORE, BE IT RESOLVED BY THE BOARD OF POLICE COMMISSIONERS THAT:

I. The Chief of Police is authorized and instructed to take Affirmative Action to promote individuals from Personnel Orders 77–527 and 77–528, pursuant to the Affirmative Action Resolution adopted by this Board on July 31, 1974, and reaffirmed on December 28, 1976, August 4, 1977, and, also, Section 7–114 of the Charter of the City of Detroit which permits the Chief of Police to pass over individuals on the eligibility register after the Chief of Police files, as he has done, written reasons acceptable to this Board.

BE IT FURTHER RESOLVED THAT:

2. An end-goal of 50% Black officers at the rank of sergeant and lieutenant is appropriate at this time in order to meet the objectives of the Affirmative Action Plan, subject to a radical shift of the demographic composition of the City of Detroit or some other unforseen factor that markedly alters the circumstances.

BE IT FURTHER RESOLVED THAT:

3. The Affirmative Action Plan for promotion to the ranks of sergeant and lieutenant will terminate when the end-goal is attained.

BE IT FURTHER RESOLVED THAT:

4. The Department is directed to develop, as soon as possible, a job-related, validated and racially-neutral promotional model for the ranks of sergeant and lieutenant.

As this Court noted in open court on March 19, 1980, the Board's 50% population-based affirmative action end-goal is reasonable. Direct support for this conclusion comes from *D. P. O. A. v. Young*, 608 F.2d 671 (6th Cir. 1979), *rev'ng* 446 F.Supp. 979 (E.D.Mich.1978). There, Judge Lively noted that "a ratio requirement equivalent to the racial proportion of the labor market ordinarily achieves the racial balance which would have existed but for discrimination." *Id.* at 697. *See Id.* at 606–97. *Accord United States v. City of Miami, Fla.*, 614 F.2d 1322, 1339 (5th Cir. 1980).

The parties are in dispute, however, over what form a final decree should take. The plaintiffs simply state that this Court found the City's action to be constitutional, and that this should be the extent of a final order. Plaintiffs apparently are considering challenging the City's affirmative action program in state court on state law grounds. The defendants want this Court to affirmatively decree that the City is to continue the affirmative action plan.

In this Court's October 1, 1979 opinion, this Court found that the City of Detroit was under an affirmative constitutional duty to conduct affirmative action promotions. The issues of past discrimination and operational need have been fully litigated. Because the City voluntarily adopted affirmative action, this suit by the white plaintiffs placed this Court in the position of reviewing the City's program and affirmative action end-goal. Had no voluntary affirmative action occurred and had black officers filed suit against the City for past discrimination, the issues would not have been significantly different. Such a suit might well have resulted in this Court's imposition of an affirmative action plan upon the City of Detroit.

■ The question that has been raised, then, is a novel one. Where an affirmative action plan has been voluntarily entered into and sustained against a reverse discrimination challenge, what is the effect of a court's ruling sustaining the affirmative action plan? In this Court's view, the City's affirmative action plan must have the force and effect of an order of this Court.

There are important reasons why this Court should enter a decree. First and foremost is judicial economy. The City's affirmative action plan as it relates to promotions from sergeant to lieutenant has been fully litigated in this forum. There is no reason to allow additional attacks on the plan to take place in the future. Second, this Court has concluded that the City is under an affirmative constitutional duty to maintain affirmative action.[2] There should

---

**2.** This court notes that in a recent case the Ninth Circuit has ruled that there is no constitutional duty for an employer to take what it terms "stacked deck" affirmative action, i. e., affirmative action which favors minority employees or applicants over majority employees or applicants. *Associated Gen. Contractors v. San Francisco Unified School Dist.*, 616 F.2d 1381 (9th Cir. 1980). The distinction between what the Ninth Circuit terms "stacked deck" affirmative action and "reshuffle" affirmative action is that in the latter instance the state only insures equal access to a benefit. This distinction has no basis in precedent, although it is an interesting one from a theoretical perspective.

In ruling that there is no constitutional duty to take race-conscious affirmative action, the Ninth Circuit fails to take into account the broad language in opinions such as *Milliken v.*

*Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) and *Louisiana v. United States*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965) that a state must "eliminate the discriminatory effects of the past as well as bar like discrimination in the future". *Id.* at 154, 85 S.Ct. at 822. The scope of the state's duty is determined by the scope of the violation. This court might agree with the Ninth Circuit that general societal discrimination against blacks does not impose a general constitutional duty to take race-conscious affirmative action. However, where harsh past discrimination has left a police or fire department with a severe underrepresentation of blacks, nothing less than race-conscious affirmative action can undo the past discrimination. Simply allowing blacks access to the department would effectively continue years of discrimination. For this reason, this court believes that there are circumstances

be no doubt about the meaning and effect of this Court's determination. Affirmative action is required, not merely permitted.

Finally, there is the important policy consideration of encouraging voluntary affirmative action. Reverse discrimination suits place an employer—especially a municipality—in a difficult position. A court which upholds a voluntary affirmative action plan against attack should protect the plan by giving it the effect of a decree. Otherwise, as appears to be the case here, continuing efforts to undermine affirmative action will take place on various fronts. The Equal Employment Opportunity Commission has promulgated guidelines concerning affirmative action. 29 C.F.R. § 1608, et seq. In these guidelines the Commission emphasized the need for voluntary compliance with Title VII and that "those taking such action should be afforded the protection against Title VII liability which the Commission is authorized to provide under Section 713(b)(1) [42 U.S.C. § 2000e–12]" 29 C.F.R. § 1608(c). These same considerations should lead this Court to protect—and supervise—a voluntary affirmative action plan. The best way to do this is to give the affirmative action plan the effect of a judicial judgment.

The procedural posture of a reverse discrimination case such as this one is very similar to that presented by a consent decree. Had black officers or the U.S. Government filed a suit alleging illegal discrimination on the part of the City of Detroit and seeking affirmative relief, it is likely that such a suit would have settled and a consent decree entered. That consent decree would then have been subject to judicial review, after due opportunity for intervention and/or objection by white officers. This was the procedural posture of, for example, *United States v. City of Miami*, 614 F.2d 1322 (5th Cir. 1980) and *United States v. City of Alexandria*, 614 F.2d 1358 (5th Cir. 1980).

A voluntary affirmative action program is very similar to an affirmative action program contained in a consent decree. In a consent decree, the parties agree on a court order in order to terminate ongoing litigation. The fact that the injunction was drafted by the parties and only subject to approval by a court does not affect its validity or enforceability as a judgment. *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

In a voluntary affirmative action situation, an employer or municipality, after making a self-assessment, institutes a voluntary affirmative action program. A suit claiming that the affirmative action plan is illegal places a court in the position of reviewing the affirmative action plan to see if it is reasonable in light of past discrimination. This is similar to the position that a court is in when it must pass on an affirmative action consent decree which has been objected to by intervening defendants. *See United States v. City of Miami, supra.* There is no reason to make meaningless distinctions. A voluntary affirmative action plan which has been challenged in court should be treated like a consent decree.

Any other ruling by this Court would needlessly encourage sham litigation.[3] An employer or municipality which contemplates voluntary affirmative action

---

where race-conscious affirmative action is constitutionally required. For the reasons outlined in its previous opinion, this court also believes that such circumstances are present in this case, and that the City of Detroit is under an affirmative constitutional duty to eliminate the effects of its past discrimination by instituting a race-conscious affirmative action plan. This court notes that this view is in accord with *DPOA v. Young*, 608 F.2d 671, 691–92 (6th Cir. 1979), which is controlling law in this circuit.

3. This problem is a real one. In *Alexander v. Bahou*, 86 F.R.D. 194 (N.D.N.Y.1980), the may-

or and fire chief of Syracuse wished to institute affirmative action, but were blocked by the New York State Civil Service Law. They then instituted an action in federal district court, seeking authority to deviate from state law to the extent necessary to increase minority hiring in the Syracuse police and fire departments. The Justice Department intervened, and filed its own Title VII suit. The entire controversy was finally resolved via a consent decree which was approved by the district judge.

would seek to protect itself by arranging a lawsuit by minority plaintiffs and then quickly consenting to affirmative action relief. A better rule of law would permit voluntary affirmative action, subject to judicial review if attacked. If the affirmative action plan is upheld, however, the approved plan should be treated as a court judgment, just as a consent decree is. It is this rule of law which this Court will adopt.

In *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) the Supreme Court established a "zone of reasonableness" for voluntary affirmative action by a private employer. This Court has taken the position that the *Weber* test should be extended to reverse discrimination claims brought under the Fourteenth Amendment. However, the complete litigation which took place here has enabled this Court to determine that affirmative action is required. The evidence in this case goes far beyond *Weber's* requirements. Thus, there is no need to outline under what specific circumstances a court should not affirmatively order that a voluntary affirmative action plan continue. Such circumstances are clearly not present here.

There is no question that this Court has the authority to enter a judgment directing that affirmative action continue. The City, in its answer, requested this relief.[4] The Seventh Circuit has recently approved an affirmative decree directing a school board to continue a voluntary desegregation plan. *Johnson v. Board of Education of City of Chicago*, 604 F.2d 504 (7th Cir. 1979) vacated for consideration of mootness, —— U.S. ——, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980). The desegregation plan in *Johnson* had been challenged by disgruntled students who were affected by it. The Seventh Circuit upheld the school board's plan, and affirmed the district court's injunction ordering that the plan continue. Accordingly, this Court will enter final judgment ordering the City of Detroit to maintain its affirmative action program.

## II. Attorney's Fees

The defendant, City of Detroit, has not requested attorney's fees from the plaintiffs. However, the intervening defendants, the Guardians, have requested that they be awarded attorney's fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e–5(k).

The Guardians of Michigan and seven individuals are the intervening defendants in this case. The intervenors are black police officers who have benefited or would benefit from affirmative action promotions.

The plaintiffs filed these cases in October and November of 1975.[5] Trial did not begin until August of 1978. The intervenors did not move to intervene until May 18, 1978. This court allowed intervention over plaintiff's objections.[6] Plaintiffs now claim that it would be unfair to order them to pay attorney's fees to the intervenors. Plaintiffs also claim that under the rule advanced in *Christiansburg Garment Co. v. EECC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) attorney's fees cannot be assessed against them unless their suit was frivolous.

The intervenors explain that they felt the need to protect their own interests. This need became acute, they say, after another district judge of this bench issued an opinion finding that affirmative action promotions of blacks from patrolmen to sergeant were unconstitutional. *DPOA v. Young*, 446 F.Supp. 979 (E.D.Mich.1978), *rev'd*, 608 F.2d 671 (6th Cir. 1979).

As this Court has noted throughout this litigation, reverse discrimination suits are far different, procedurally and analytically, from "ordinary" discrimination suits. The

---

4. *See* plaintiff's request for relief, in Answer to First Amended Complaint, filed May 25, 1977.

5. Case No. 5–71937 was filed on October 7, 1975, by Kenneth A. Baker and six other individuals. Case No. 5–72264 was filed by Hanson Bratton, four other individual white male sergeants and the Detroit Police Lieutenants and Sergeants Association. This latter case was filed in Wayne County Circuit Court, and was removed to this court on November 26, 1975.

6. The Motion to Intervene was granted on July 6, 1978.

employer which voluntarily initiates affirmative action and is sued by a person who is adversely affected by the program is in a difficult position. The employer may have to show its own past discrimination against blacks to justify its affirmative action plan. For a variety of reasons, employers will be reluctant to do this. This was the dilemma which the Supreme Court answered in *Weber* regarding a private employer: voluntary affirmative action is proper when it is a temporary response to a radical imbalance in traditionally segregated job categories. That way an employer does not have to indict itself to justify the voluntary affirmative action program.

At the time of trial in this case *Weber* had not been decided. Today *Weber's* applicability to state employers is not definitely settled, although it soon may be. *See Minnick v. California Dept. of Corrections,* 95 Cal.App.3d 506, 157 Cal.Rptr. 260 (1st App. Dist.) (1979), *cert. granted,* —— U.S. ——, 101 S.Ct. 348, 66 L.Ed.2d 211 (1980). One way to minimize the employer's dilemma in a reverse discrimination case is to allow intervention by parties who have an incentive to introduce evidence of past discrimination. That is why this Court allowed the Guardians to intervene in this case.

There was sound reason to allow intervention. There was no guarantee that the City would provide extensive evidence of its own past discrimination in justification of the affirmative action plan. The district court in *DPOA v. Young,* 446 F.Supp. 979 (E.D.Mich.1978) had not found the City's justification for affirmative action to be acceptable. Fairness dictated that the black police officers who would be hurt by a ruling against affirmative action be heard. This is especially true since, in their amended complaint, the Bratton plaintiffs, among other forms of relief, requested that black officers who had already received affirmative action promotions be demoted to their prior rank.[7]

As it turned out, the City defendants, at trial, did present extensive evidence of past discrimination. With hindsight it could be argued that the presence of counsel for intervenors was unnecessary. At the same time, counsel for intervenors did an excellent job at trial. Counsel did not interfere with the presentation of either side's case. Counsel protected intervenor's interests, and presented useful additional evidence at trial on the issue of past discrimination. Perhaps the intervenors should have moved to intervene earlier. However, the plaintiffs suffered no prejudice from this.

■ This Court feels that an award of attorney's fees is proper here. Counsel for intervenors helped demonstrate why the City's affirmative action program was a necessary response to past discrimination. The intervenors furthered an important public policy of ensuring that the State remedy past discrimination.

It is especially appropriate that the Detroit Police Lieutenant's and Sergeant's Association (LSA) pay for the intervenor's attorneys fees.[8] The LSA is the union to which all of Detroit's Lieutenants and Sergeants must belong. This litigation has been funded, on the plaintiff's side, by the LSA. The union made a special ½% assessment of its membership to pay for this litigation. Thus, both white and black officers are helping pay for the plaintiff's case.

When confronted with evidence of past discrimination, the City of Detroit chose to favor black officers in promotions. The police union was then caught in a dilemma. Should it fight the affirmative action promotions or not? If the union opposed affirmative action, it would advance the interests of its white members at the expense

---

**7.** Bratton First Amended Complaint at 8. At the beginning of trial, the intervenors secured a stipulation with the plaintiffs striking this request for relief from the plaintiff's complaint.

**8.** At the hearing held on this motion on March 19, 1980, counsel for intervenors made it clear that the request for attorney's fees was directed against the union, and not the individual named plaintiffs. Counsel for the union did not object to this limitation. This court agrees. Any attorney's fees should be paid by the union, and not individual plaintiffs.

of its black members. If the union acquiesced in affirmative action, it would be doing the opposite. The union chose to advance the position which was favored by a majority of its members—no affirmative action. By taking this position, however, the union was acting contrary to the interests of its black officers. Especially since the black officers have prevailed in this litigation, it is just to have the union pay for the representation afforded its own minority officers. The Court repeats that counsel for the intervenors played an important, but subordinate, role in these proceedings. Counsel ensured that the interests of black officers would be fully protected.

■ This Court believes that it has clear authority to award attorney's fees in this unique situation. It is true that ordinarily a prevailing defendant can only collect attorney's fees under 42 U.S.C. § 1988 if plaintiff's suit was frivolous, unreasonable, or without foundation. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). In contrast, under 42 U.S.C. § 1988 or 42 U.S.C. § 2000e–5(k), a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances. *Christiansburg Garment Co., supra* at 416–17, 98 S.Ct. at 697–698. The rationale for this two-tiered standard comes from *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Ordinarily plaintiffs, unlike defendants, are "private attorney generals" who act to eradicate unlawful discrimination. Thus, a defendant who is victorious should ordinarily not be allowed to collect attorney's fees unless the suit brought against him was baseless. Otherwise, too many plaintiffs would be deterred—and punished—for bringing discrimination claims. *See Christiansburg Garment Co., supra*, 434 U.S. at 419–20, 98 S.Ct. at 699–700.

This court has no quarrel with the *Christiansburg* rule. However, the Court feels that it is not applicable in the unique circumstances of this case. Direct support for this Court's conclusion is contained in the legislative history of the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988.

In the large majority of cases that party or parties seeking to enforce such [civil] rights will be the plaintiffs and/or plaintiff-intervenors. However, in the procedural posture of some cases, the parties seeking to enforce such rights may be the defendants and/or intervenors. *See e. g. Shelley v. Kraemer*, 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161] (1948).

S.Rep.No.94–1011, 94th Cong.2d Sess. 4, n. 4, U.S.Code Cong. & Admin.News, 1976, pp. 5908, 5912 (1976).

In *Shelley v. Kraemer, supra*, cited by the Senate Report, the Supreme Court reversed judgments of the Missouri and Michigan Supreme Courts. In the state courts, white plaintiffs had prevailed in their claims that restrictive racial covenants in the deeds of certain property were valid, and prevented blacks from owning the property. The Supreme Court held that the restrictive covenants violated the Fourteenth Amendment, and reversed. In that case, it happened that the parties whose rights were vindicated were defendants.[9]

■ In the case at bar, it happens that the intervenors were defendants. They just as easily could have been plaintiffs or intervening plaintiffs had they, the United States, or other black officers filed suit against the City. The Civil Rights Attorney's Fee Act is to be liberally construed to effectuate its purposes. *See Northcross v. Bd. of Ed. of Memphis Schools*, 611 F.2d 624, 632–33 (6th Cir. 1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). The procedural posture of the case should not be dispositive. The intervenors have vindicated their rights, and this Court

**9.** Additional support is present in *Prate v. Freedman*, 583 F.2d 42, n. 2 (2d Cir. 1978) where the court in *dicta* stated:

It may well be that defendants may on occasion be characterized as "private attorneys general" who are entitled to the more favorable Supreme Court standard [in *Christiansburg*].

believes it just and reasonable for the union to pay their attorney's fees. Accordingly, this Court does not feel that the restrictive *Christiansburg* defendant-recovery rule is applicable here. *See Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980); *Kingsville Indep. School Dist. v. Cooper*, 611 F.2d 1109, 1114 (5th Cir. 1980). *See also Haycraft v. Hollenbach*, 606 F.2d 128 (6th Cir. 1979) (attorney's fees awarded against intervening defendant pursuant to the Emergency School Act of 1972); *Brennan v. United Steelworkers of America*, 554 F.2d 586 (3rd Cir. 1977), *cert. denied*, 435 U.S. 977, 98 S.Ct. 1627, 56 L.Ed.2d 71 (1978). (Intervening plaintiff in Landrum-Griffin Act case could recover attorney's fees).

In summary, this Court finds that an award of attorney's fees is warranted. The presence of counsel for intervenors was useful and necessary. Counsel helped his clients to vindicate their rights. In the circumstances of this case, it is just to have the Lieutenant's and Sergeant's Association pay for the representation of both its black and its white officers.

The Court notes that this sum should not be onerous. The intervenors did not take part in most pre-trial discovery. At trial, counsel for intervenors played a subsidiary role while counsel for plaintiffs and defendants presented the bulk of the testimony. Counsel for plaintiffs and counsel for intervenors are urged to agree on a figure for reasonable attorney's fees. Absent agreement, this Court will establish a figure after all appeals have been exhausted.[10]

### III. Costs

Because of the novel nature of this litigation, this Court feels that all parties should bear their own costs in this Court.

### IV. Conclusion

In sum, this Court finds that the City's Affirmative Action Plan is both reasonable and required. The plaintiff Police Lieuten-

ant's and Sergeant's Association shall pay reasonable attorney's fees to the intervening defendants. All other parties will bear their own costs.

---

**10.** This court's determination that attorney's fees should be awarded is a final, appealable order, even absent a determination of the exact amount to be awarded. *Memphis Sheraton Corp. v. Kirkley*, 614 F.2d 131 (6th Cir. 1980).