## MINNICK ET AL. v. CALIFORNIA DEPARTMENT OF CORRECTIONS ET AL.

No. 79–1213.  Argued December 2, 1980—Decided June 1, 1981

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. REHNQUIST, J., filed a concurring opinion, *post,* p. 127. BRENNAN, J., filed an opinion concurring in the judgment, *post,* p. 127. STEWART, J., filed a dissenting opinion, *post,* p. 128.

*Ronald Yank* argued the cause for petitioners. With him on the briefs was *Gary M. Messing.*

*Stuart R. Pollak* argued the cause for respondents. With him on the brief was *Steven Lee Mayer.**

JUSTICE STEVENS delivered the opinion of the Court.

Petitioners contend that an affirmative-action plan adopted by the California Department of Corrections in 1974 is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. The trial court agreed and entered judgment in petitioners' favor. The California Court of Appeal reversed, 95 Cal. App. 3d 506, 157 Cal. Rptr. 260, holding that the trial court's rationale was no longer tenable in light of this Court's intervening decision in *University of California Regents* v. *Bakke,* 438 U. S. 265. The Court of Appeal's

---

*Briefs of *amici curiae* urging reversal were filed by *Robert A. Helman, Douglas A. Poe, Meyer Eisenberg, Justin J. Finger, Jeffrey P. Sinensky,* and *Richard A. Weisz* for the Anti-Defamation League of B'Nai B'Rith; and by *Robert E. Williams, Douglas S. McDowell,* and *Daniel R. Levinson* for the Equal Employment Advisory Council.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Assistant Attorney General Days, Deputy Solicitor General Wallace, Edwin S. Kneedler, Brian K. Landsberg, Jessica Dunsay Silver, Leroy D. Clark, Lutz Alexander Prager,* and *Paul E. Mirengoff* for the United States et al.; by *Robert Abrams,* Attorney General of New York, *Shirley Adelson Siegel,* Solicitor General, *Robert Hermann* and *Peter Bienstock,* Assistant Attorneys General, and *Daniel Berger,* Deputy Assistant Attorney General, for the New York State Department of Correctional Services; by *Charles Stephen Ralston, Jack Greenberg, Eric Schnapper, O. Peter Sherwood,* and *Barry L. Goldstein* for the City of Detroit; by *E. Richard Larson, Isabelle Katz Pinzler,* and *Bruce J. Ennis* for the American Civil Liberties Union et al.; and by *Mark N. Aaronson* and *Thomas A. Seaton* for the California Department of Fair Employment and Housing et al.

Briefs of *amici curiae* were filed by *J. Albert Woll, Laurence Gold, Michael H. Gottesman,* and *Robert M. Weinberg* for the American Federation of Labor and Congress of Industrial Organizations; and by *Ronald A. Zumbrun* and *John H. Findley* for the Pacific Legal Foundation.

opinion, however, also identified certain problems that "require examination if the case is to be retried." Thus although we granted certiorari to review the merits of the Court of Appeal's decision, 448 U. S. 910, we first must confront the question whether the writ should be dismissed because the judgment did not finally determine the legal status of the challenged plan.

I

The 1974 "Affirmative Action Program," as revised in 1975, is a lengthy and somewhat ambiguous document. Much of the plan relates to the Department's commitment to the eradication of discrimination on the basis of race and sex. The plan's first section, which describes the program in general terms, states:

> "It is the policy of the Department of Corrections to provide equal employment opportunities for all persons on the basis of merit and fitness and to prohibit discrimination based on race, sex, color, religion, national origin, or ancestry in every aspect of personnel policy and practices in the employment, career development, advancement and treatment of employees." [1]

This section of the plan then identifies specific means of implementing this general nondiscriminatory policy. [2] The second section of the plan, which establishes guidelines for the implementation of the program within the existing organizational structure and defines the affirmative-action roles

---

[1] App. 3.

[2] "Specific actions required by [the] plan" include, *inter alia,* increasing the number of female and minority employees through "programs for recruiting, selecting, hiring, and promoting minorities and women," monitoring employment practices related to employment of women and minorities, establishing goals for measuring success in complying with nondiscrimination laws, training staff to "develop a sensitivity . . . to recognize and positively deal with discriminatory practices," and training women and minority employees to assure their full participation at all employment levels. *Id.,* at 3–4.

of Department employees, also contains a number of provisions suggesting that the plan was intended to remove any barriers to equal employment opportunities.[3] Finally, the third section, which identifies specific objectives of the plan, also refers to departmental efforts to eliminate discrimination in hiring and in employment practices.[4]

The plan does, however, contain some indication that the Department intended to go beyond the eradication of discriminatory practices. The second section states that deputy

---

[3] The plan, for example, provides for the creation of various new positions, including a supervisor for the human relations section:

"The Supervisor, Human Relations Section, under the direct supervision of the Assistant Director, Personnel Management, and Training Division, shall have authority and responsibility for the following duties:

.          .          .          .          .

"7. Provide assistance to the Departmental Training Officer and local Training Officers in developing training relative to human relations and affirmative action.

"8. Review the department's programs and procedures related to personnel activities and make recommendations for any changes necessary to remove barriers to attainment of equal employment opportunity.

"9. Develop procedures with the Assistant Director, Womens Affairs for the receipt and the investigation of allegations and complaints by individuals, organizations, employees, or other third parties of discrimination on grounds of race, color, sex or national origin." *Id.*, at 8–10.

Each division, institution, and parole region was to appoint an Affirmative Action Representative, whose duties include acting as liaison between "management and program staff, various organization units, special interest groups and organizations, [and] community leaders," analyzing discrimination complaints to identify problem areas and assist in their resolution, and assisting in the development of a written recruitment plan. *Id.*, at 11.

[4] The plan has as some of its objectives recruitment programs designed to reach minority communities and schools with significant minority enrollments, *id.*, at 20–21, continuous review of job requirements to insure that qualification standards "are based upon the minimum required to perform necessary duties," *id.*, at 23, on-the-job training to prepare employees to meet the requirements of their jobs, *id.*, at 25, and the communication to managers, supervisors, and employees of the commitment of the Department to equal employment opportunity. *Id.*, at 27.

directors, assistant directors, and division chiefs were to be responsible for developing a plan to "correct identifiable . . . deficiencies through specific, measurable, attainable hiring and promotional goals with target dates in each area of underutilization."[5] The plan also refers to "guidelines" issued by the Law Enforcement Assistance Administration of the United States Department of Justice (LEAA) indicating "that an Agency's percentage of minority personnel should be at least 70% of that minority in its service (inmate population)."[6] Moreover, the plan notes that in "the total labor force in California, 38.1% are female; Department of Corrections' personnel reflect a total of only 17.3%."[7] The section of the plan containing objectives indicates a commitment by the Department to "[i]ncrease departmental efforts to employ minorities and women to achieve the percentages . . . per LEAA guidelines within five (5) years," and to achieve a work force containing 36% minorities and 38% women.[8] The plan does not identify what means, in addition to eradicating discriminatory practices, the Department would employ to achieve these percentages. Thus, the plan may be interpreted as predicting that a nondiscriminatory policy would result in a work force including 36% minority and 38% female employees by 1979; alternatively, it may be read as

---

[5] *Id.*, at 6.

[6] *Id.*, at 28. The plan then continues: "On this basis, Black personnel should represent at least 22.5% of the departmental work force, whereas they apparently comprise 8.8%. Similarly, Spanish surname personnel should represent 12.1%, but actually comprise 7.4%. Native American personnel should comprise .7%, while they actually make up .2%. Only the Asian and other extraction are represented in accord with the guidelines." *Id.*, at 28–29.

[7] *Id.*, at 31.

[8] *Id.*, at 16–17. The plan contains detailed statistics relating to the number of employees of different groups referred to as "Black," "Asian," "Spanish surnamed," "native American," and "other extraction," as well as breakdowns by sex, in different positions and in the various facilities operated by the Department of Corrections. *Id.*, at 28–65.

mandating affirmative action to achieve these percentages by the target date.[9]

### II

In December 1975 the three petitioners commenced this litigation in a California Superior Court. Minnick and Darden, the individual petitioners, are white male correctional officers. The third petitioner, the California Correction Officers Association (CCOA), is an employee organization that represents correctional officers and some other employees of the Department. In their complaint petitioners alleged that the affirmative-action plan unlawfully discriminated against white males and that the individual petitioners had been denied promotions because they were white.

---

[9] For example, one of the stated objectives of the plan is "to increase significantly the utilization of minorities and women across organizational units of the CDC and at all levels possible as vacancies occur." The first "specific action" listed to accomplish this objective relates to the elimination of discrimination by committing the department to

"[d]evelop recruitment plans and public relations activities with specific focus on minority communities, organizations, and women organizations, to inform them of career opportunities within CDC and the desire to employ minorities and women."

The second "specific action" is to "increase departmental efforts to employ minorities and women" to achieve the LEAA percentages and the 36% minority and 38% female percentages. *Id.,* at 16. No specific means of achieving this goal are indicated. The plan's use of the LEAA guidelines does not clarify the intended implementation of the plan. In discussing the LEAA guidelines, the plan states:

"To provide agencies goals, equal employment opportunity guidelines have been issued by the U. S. Department of Justice. They specify that the percentage of minority staff in the employment of the agency be at least 70% of the percentage of the minorities in the service (inmate) population." *Id.,* at 38 (footnote omitted).

The LEAA guidelines' explanation of their purpose states, in part, that the experience of the LEAA "has demonstrated that the full and equal participation of women and minority individuals in employment opportunities in the criminal justice system is a necessary component to the Safe Streets Act's program to reduce crime and delinquency in the United States." *Id.,* at 71. See 28 CFR § 42.301 (1980).

The California Department of Corrections and various state officers named as defendants, respondents here, denied in the trial court that they had discriminated in hiring and promotion and claimed that the Department's central policy was to hire and promote only the most qualified persons.[10] Alternatively, however, the respondents contended that the State's interest in the efficient and safe operation of the corrections system justifies an attempt to obtain a work force containing a proportion of minority employees amounting to at least 70% of any minority's proportional representation in the inmate population, and also containing as large a percentage of female employees as are found in the total California work force.[11] During pretrial discovery, respondents also indicated that the impact of their past practices had resulted in a disproportionate hiring and promotion of white males, but stated "for the purposes of this litigation" that

---

[10] See Tr. 194, 203–206, 383, 452–453, 487–488, 548, 563–564, 591, 666, 668, 672, 773, 792, 882. George C. Jackson, then the Deputy Director of the Department, testified that the program's goal was "to make the Department of Corrections a fair place to work." *Id.*, at 665.

[11] The Deputy Attorney General defending the case on behalf of the respondents stated at trial:

"Our defense is on two levels, your honor.

"First of all, we're contending in this case that the Department only hires the most qualified people, and that's their policy. There may be exceptions down below, but that's their policy.

"On the other hand, if the Court so should find that they're using race as a factor in the hiring process as a qualification process, then we have the burden of showing that they must demonstrate a real reason for doing this. And that's what we've been trying to do with these witnesses, showing they have a real problem.

.         .         .         .         .

"I have a compelling state interest if the Court should find that race is being used as a factor. To do that, I have to show that they have a real problem that they're trying to solve, the violence in the prisons, the operation of the prisons.

"And the next step is to show that they're trying to solve it by hiring minorities in the ratios they're trying to hire." *Id.*, at 660–661.

112

they did not allege that the Department had engaged in any past intentional discrimination against minority or female workers.[12]

After a trial at which over 30 witnesses testified, the case was argued at length and submitted to the trial judge for decision on November 23, 1976. At that time the Supreme Court of California had only recently held in *Bakke* v. *University of California Regents,* 18 Cal. 3d 34, 553 P. 2d 1152 (1976), that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibited a state university from giving any consideration to an applicant's race in making admissions decisions.

On January 5, 1977, the trial judge issued a "notice of intended decision" which tersely summarized the parties' respective positions:

"The testimony and documentary evidence herein show, and defendants admit, that defendants have carried on a campaign to, and they do now, select applicants for employment and for promotion based on their sex and on their racial background or ancestry.

"Defendants seek to justify their actions on the basis that while the sex of an applicant is *one* of the factors considered, the applicant must be otherwise qualified for the duties to be performed. Sex or racial background is not the *sole* factor considered. Plaintiffs on the other hand assert that the hiring or promotion of a person based in whole or in part on sex or racial background or ancestry is unconstitutional and void.

"The Court agrees with plaintiffs." App. to Pet. for Cert. D-1—D-2.

The notice then directed that an injunction issue enjoining the respondents "from considering as a factor for employment or for the promotion of a candidate his sex, race or na-

[12] Clerk's Transcript on Appeal 121–122.

tional origin." *Id.*, at D–2. The court directed counsel to prepare an appropriate order and to submit proposed findings of fact and conclusions of law.

Before any further order was entered, respondents filed a motion to reopen the record and to receive detailed evidence of past discriminatory practices.[13] Presumably the proffered evidence would provide support for a defense based on the theory that the plan was justified as a remedy for past discrimination. The evidence was, however, quite plainly irrelevant to the theory of the trial judge's intended decision which was, of course, wholly consistent with the rationale of the California Supreme Court's opinion in *Bakke, supra.* The trial judge summarily denied the motion to reopen.

On October 11, 1977, the trial court entered findings of fact and conclusions of law, a declaratory judgment, and a permanent injunction. *Id.*, at F–1, G–1. The court did not find that either of the individual petitioners had been denied a promotion on the basis of his race or sex. Nor did the court find that the CCOA had standing to bring the action. Two of the findings that the court did enter (No. 8 relating to hiring and promotions and No. 19 relating to job assignments) are especially relevant to the procedural issue before us.

Finding No. 8 provides, in part:

> "Defendants Department of Corrections and Jeri J. Enomoto have discriminated and are continuing to discriminate by reason of sex and by reason of ethnic background in hiring and promotion of employees in the Department.
>
> .    .    .    .    .
>
> "In so doing, preferences result in favor of certain ethnic groups, or in favor of one sex to the detriment of the other, and not solely on the qualifications of the individuals involved, or their merits." *Id.*, at F–4.

---

[13] Tr. 670–671.

Finding No. 19 provides:

> "The unique and sensitive nature of the functions of the Department of Corrections and the peculiar difficulties inherent in the administration of California's prison system require the Department to exercise broad discretion in making job assignments and in determining the employment responsibilities of its employees. Because of the conditions and circumstances within California prisons and throughout the Department of Corrections, in making job assignments and in determining employment responsibilities it is necessary for the Department to consider, among other factors, the composition of the existing work force and of the inmate population, and the race and sex of employees, in order to serve the compelling state interest in promoting the safety of correctional officers and inmates, encouraging inmate rehabilitation, minimizing racial tensions, and furthering orderly and efficient prison management." *Id.*, at F-6—F-7.

In the conclusions of law and in the permanent injunction, the trial court distinguished hiring and promotion decisions, on the one hand, from job assignments and determination of employment responsibilities, on the other. Finding No. 19 relates only to the latter and provides the basis for the trial court's conclusion that respondents could lawfully consider race and sex as factors in determining job assignments and job responsibilities.[14] That finding also explains the proviso in the permanent injunction allowing the use of race or sex as a factor in making job assignments.[15] Finding No. 8,

---

[14] Conclusion of Law No. 4 reads as follows:

"It is not contrary to law for the Department, in determining job assignments and job responsibilities of its employees, to consider, among other relevant factors, the composition by race and sex of the existing work force and of the inmate population, and the race and sex of the employees in question." App. to Pet. for Cert. F-8.

[15] The permanent injunction contains the following proviso:

"(a) Provided, however, that nothing in this Order shall prevent any

however, provides the central support for the permanent injunction against giving any preference, advantage, or benefit on the basis of race or sex in hiring or promoting any employee.[16]

### III

Respondents appealed to the California Court of Appeal. While their appeal was pending, this Court issued its decision in *University of California Regents* v. *Bakke,* 438 U. S. 265. Although we affirmed the judgment of the California Supreme Court to the extent that it had ordered the University to admit Bakke to its medical school, the opinions supporting that decision indicated that at least five Members of the Court rejected the legal theory on which the California Supreme Court had relied. Specifically, both the opinion of JUSTICE BRENNAN, JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN and the opinion of JUSTICE POWELL unequivocally stated that race may be used as a factor in the admissions process in some circumstances.[17] To the extent that those opinions demonstrated that the California Su-

person, in determining the assignments and job responsibilities of employees of the Department of Corrections, from considering, among other relevant factors, the race and sex of the employees in question." *Id.,* at G–2.

[16] The permanent injunction enjoins respondents "[f]rom hiring or promoting any employee in the Department of Corrections in which preference, advantage, or benefit is given to race, color, sex, or national origin." *Ibid.*

[17] JUSTICE BRENNAN, JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN joined Part V–C of JUSTICE POWELL's opinion, which stated:

"In enjoining petitioner from ever considering the race of any applicant, however, the courts below failed to recognize that the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin. For this reason, so much of the California court's judgment as enjoins petitioner from any consideration of the race of any applicant must be reversed." 438 U. S., at 320.

See also *id.,* at 325 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).

preme Court's interpretation of the Fourteenth Amendment was erroneous, they also demonstrated that the trial judge's faithful application of that court's *Bakke* rationale in this case was an insufficient basis for supporting the injunction.

With the guidance of this Court's decision in *Bakke,* the California Court of Appeal reversed the judgment and the injunction entered by the trial court in this case. Relying largely on JUSTICE POWELL's opinion in *Bakke,* the Court of Appeal concluded that race or sex could be used as a "plus" factor in personnel decisions that promoted a compelling state interest.[18] The court seemed to indicate that the trial court's finding No. 19 supported a conclusion that the State's interest in a safe and efficient prison system constituted such an interest.[19]

With respect to the challenge to hiring procedures, the Court of Appeal concluded that the evidence was insufficient to support finding No. 8 insofar as that finding related to preferences in favor of males over females or insofar as it

---

[18] The court interpreted JUSTICE POWELL's opinion to permit consideration of race in the school admissions process to serve the compelling state interest of promoting ethnic diversity among the students if

"(1) '. . . race or ethnic background may be deemed a "plus" in a particular applicant's file, yet . . . does not insulate the individual from comparison with all other candidates for the available seats'; and (2) a candidate not credited ·with that 'plus' will be 'fairly and competitively' evaluated for all the seats without being 'totally excluded from a specific percentage' of thcm which has been restricted to a particular racial or ethnic group. [438 U. S., at] 316–319." 95 Cal. App. 3d, at 520, 157 Cal. Rptr., at 268.

[19] Although finding No. 19 related only to transfer and assignment policies, the court seemed to rely on that finding to support the threshold proposition that the State has a compelling state interest in the safe operation of its prison system:

"In its finding no. 19, the trial court effectively determined that the practices apply the prison-related realities of race and sex to the point of promoting a 'compelling state interest' in a safe and efficient correctional system." *Id.,* at 520–521, 157 Cal. Rptr., at 268.

related to the hiring of any employees.[20]   References to the possibility of a retrial in other portions of the opinion,[21] imply that petitioners will have an opportunity to remedy any deficiencies in their proof of sex discrimination or racial discrimination in hiring.

With respect to the challenge to promotion practices, the Court of Appeal apparently believed that the trial court's finding of discrimination in finding No. 8 was inconsistent with the trial court's finding No. 19.[22]   Although finding No.

---

[20] "The terminal question is whether this record supports the declaration, in paragraph 1 of the judgment, that the department and Enomoto violated the Equal Protection Clause by 'discriminating' on the bases of race and sex in the 'hiring and promotion of employees.' The declaration rests on the trial court's finding (No. 8) that they had 'discriminated' in those respects by applying personnel practices from which 'preferences result in favor of certain ethnic groups or . . . of one sex.' (See fn. 5, *ante.*) According to our review of the evidence, it does not support a finding that 'preferences result' from the practices in favor of males or in the 'hiring' of employees. Finding No. 8 therefore fails to support the declaration in either respect." *Id.*, at 521, 157 Cal. Rptr., at 269.

[21] "If the case is to be retried, Justice Powell's decision in *U. S. Bakke* will be pertinent to the determination of either question. (See *U. S. Bakke, supra,* 438 U. S. 265 at pp. 307–310 . . . .)

.        .        .        .        .

"These problems require examination if the case is to be retried." *Id.*, at 526, 157 Cal. Rptr., at 272.

[22] After the court cited finding No. 19 and identified the compelling state interest in the safe and efficient operation of the prison system, the court stated:

"The department is pursuing those objectives by assigning a female or minority employee a 'plus' in competition for promotion or transfer. The qualifications of other employees in the competition are still 'weighed fairly and competitively.'" *Id.*, at 521, 157 Cal. Rptr., at 268.

After concluding that the proof of discrimination was insufficient as to the hiring challenge, the court stated:

"The practices otherwise identified in [finding No. 8] have just been examined in light of *U. S. Bakke* and under the 'strict scrutiny' it commands. We conclude that they are permitted by the Equal Protection

19 clearly applies only to transfers, the court seems to have read that finding to identify a compelling state interest and then to have determined that the evidence adequately justified the use of race as a plus factor for promotions as well as transfers. The court, however, may have merely intended to identify a permissible analysis of the record that will be open to the trial court on remand.[23] If a final and definitive de-

Clause within the limited extent that noncontrolling 'preferences result in favor of certain ethnic groups' for purposes of promotion or transfer of personnel within the department, because they are necessary to promote the compelling interest of this state in the proper management of its correctional system. For the same reasons, they are permitted insofar as the same limited 'preferences result' in favor of women. Finding No. 8 accordingly fails to support the declaration that the Department and Enomoto violated the Equal Protection Clause in any respect." *Id.*, at 521–522, 157 Cal. Rptr., at 269.

[23] In its discussion of finding No. 19, which applied only to transfers and work assignments, the court indicated that the record established that the Department was assigning minority employees a " 'plus' in competition for promotion or transfer." In its discussion of finding No. 8, which did relate to promotions, the court stated only that the Department's promotion practices are justified "within the limited extent that noncontrolling preferences result in favor of certain ethnic groups" and "insofar as the same limited 'preferences result' in favor of women." In its discussion of finding No. 8, the court did not state that such preferences in fact existed.

Even in its discussion of what the evidence at trial indicated, the Court of Appeal was somewhat equivocal:

"There was evidence that various male Caucasian employees had been denied promotion or transfer in instances where preference had been given to female or minority members.

.    .    .    .    .

"Various supervisory employees of the department testified that preference for promotion or transfer was *not* given to female or minority employees ·in specified segments of the department after 1974. There was thus a conflict in the evidence as to how widely the preferential policies expressed in the AAP had been pursued within the department. According to all the evidence of instances where they had been applied, 'preference' was given to female sex or minority status only to the extent that each was considered a 'plus' factor in the assessment of a particular em-

termination of the federal issue was actually intended, it is difficult to understand why the court left open the possibility of retrial and did not unequivocally direct that judgment be entered in favor of respondents.

Recognizing that the evidence of past discrimination that had been proffered by respondents might be relevant in support of a defense that the affirmative-action program was justified as a remedy for past discrimination within the Department of Corrections,[24] the Court of Appeal also left open for the retrial the question whether that evidence should be received. Finally, the Court of Appeal rejected each of petitioners' contentions that a violation of state law or federal statutory law had been proved, and then concluded by noting that jurisdictional problems concerning petitioners' standing "require examination if the case is to be retried." [25]

---

ployee for promotion or transfer. Some evidence supported the inference that this 'plus' had occasionally contributed to the promotion or transfer of the preferred employee ahead of nonpreferred candidates who were otherwise more qualified for the new position. There was no evidence that such 'preference' had ever resulted in the promotion or transfer of an employee who was *not* qualified to hold the position.

"Vacancies in specific positions were occasionally left open, and promotions or transfers to them were sometimes delayed, until qualified female or minority employees could be found to fill them. Some of these positions were labelled 'female only,' or with words similarly referring to sex (including 'male only') or to race or ethnic background. There was no evidence that any specific number or percentage of positions were reserved for members of either sex or of any racial or ethnic group." *Id.*, at 514–515, 157 Cal. Rptr., at 264.

[24] The trial court had found that the plan could not be justified as a remedy for past societal discrimination but had not addressed the question whether it would be justified by past departmental discrimination. See finding No. 13, App. to Pet. for Cert. F-5.

[25] 95 Cal. App. 3d, at 526, 157 Cal. Rptr., at 272. The Court of Appeal noted that the petitioners had not been permitted to maintain a class action, that the individuals had not proved that they were entitled to relief, and that CCOA did not represent all employees of the Department. Although the respondents had stipulated that the petitioners had stand-

## IV

In this Court respondents, as well as the Solicitor General on behalf of the United States as *amicus curiae,* urge us to dismiss the writ because the judgment of the Court of Appeal is not final.[26]   See *Gospel Army* v. *Los Angeles,* 331 U. S. 543. The judgment is clearly not final in the sense that no further proceedings can possibly take place in the state judicial system.   Petitioners argue, however, that there is finality under our cases because the ultimate judgment on the federal issue is for all practical purposes preordained.   This argument is supported by a representation made by petitioners' counsel at oral argument in this Court that the record already contains all of the evidence that they are prepared to offer.[27] Nevertheless, we are not persuaded that the outcome of further proceedings in the trial court can be characterized as "certain" or that these proceedings will not have a significant effect on the federal constitutional issues presented by the certiorari petition.[28]

---

ing, the Court of Appeal stated that the trial court's jurisdiction could not be created by stipulation.   *Ibid.*

[26] Petitioners have invoked this Court's jurisdiction under 28 U. S. C. § 1257 (3), which provides:

"Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:

.          .          .          .          .

"(3) By writ of certiorari, where the validity of a treaty or statute of the United States is drawn in question or where the validity of a State statute is drawn in question on the ground of its being repugnant to the Constitution, treaties or laws of the United States, or where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes of, or commission held or authority exercised under, the United States."

[27] Tr. of Oral Arg. 20–21.

[28] The questions presented in the petition for certiorari are:

"1. Whether a state agency may, absent proof that it has engaged in previous intentional discrimination, voluntarily establish goals, set aside

In *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, this Court identified four categories of cases in which a state court's decision of a federal issue had been treated as a final judgment even though additional proceedings in the state trial court were anticipated. Petitioners contend that this case falls within the first of those categories—that it is a case in which "for one reason or another the federal issue is conclusive or the outcome of further proceedings is preordained." [29] That category is, however, delimited by a preliminary comment in the *Cox* opinion:

"In the cases in the first two categories considered below,

positions and grant preferences, for the hiring and promotion of less qualified minorities and women, to the detriment of all other applicants and employees.

"2. Whether the safe and efficient operation of correctional facilities constitutes a sufficient compelling interest to justify the use of racial and sex-based preferences in hiring and promotion, and if so, whether proof of that interest was sufficiently supported by the record.

"3. Whether it is sufficient for a state agency to adopt preferential employment practices based solely upon conclusory allegations of the discriminatory impact of its past policies and practices on minorities and women.

"4. Whether it is appropriate for a state correctional institution to institute employment goals for minorities based upon inmate population rather than the relevant labor market or applicant flow.

"5. Whether the relevant labor force for the hiring of women should be based on state-wide employment statistics for women as opposed to applicant flow or the labor force statistics for women in the relevant geographic area in which the institutions are located." Pet. for Cert. 2–3.

[29] "In the first category are those cases in which there are further proceedings—even entire trials—yet to occur in the state courts but where for one reason or another the federal issue is conclusive or the outcome of further proceedings preordained. In these circumstances, because the case is for all practical purposes concluded, the judgment of the state court on the federal issue is deemed final. In *Mills* v. *Alabama,* 384 U. S. 214 (1966), for example, a demurrer to a criminal complaint was sustained on federal constitutional grounds by a state trial court. The State Supreme Court reversed, remanding for jury trial. This Court took jurisdiction on the reasoning that the appellant had no defense other than his

the federal issue would not be mooted or otherwise affected by the proceedings yet to be had because those proceedings have little substance, their outcome is certain, or they are wholly unrelated to the federal question." *Id.,* at 478.

The answer to the question whether the further proceedings in the state trial court "have little substance" or are "wholly unrelated to the federal question" is affected not only by the specifics of the particular litigation but also by the extent to which the "policy of strict necessity in disposing of constitutional issues," *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568, is implicated.[30] In that case, not-

---

federal claim and could not prevail at trial on the facts or any nonfederal ground. To dismiss the appeal 'would not only be an inexcusable delay of the benefits Congress intended to grant by providing for appeal to this Court, but it would also result in a completely unnecessary waste of time and energy in judicial systems already troubled by delays due to congested dockets.' *Id.,* at 217–218 (footnote omitted)." 420 U. S., at 479.

[30] Commenting on the close connection between the policy of avoiding the premature adjudication of constitutional issues and the limitations on our jurisdiction, the Court wrote:

"Indeed in origin and in practical effects, though not in technical function, it is a corollary offshoot of the case and controversy rule. And often the line between applying the policy or the rule is very thin. They work, within their respective and technically distinct areas, to achieve the same practical purposes for the process of constitutional adjudication, and upon closely related considerations.

"The policy's ultimate foundations, some if not all of which also sustain the jurisdictional limitation, lie in all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality. They are found in the delicacy of that function, particularly in view of possible consequences for others stemming also from constitutional roots; the comparative finality of those consequences; the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority; the necessity, if government is to function constitutionally, for each to keep within its power, including the courts; the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources

withstanding a conclusion that the Court had jurisdiction to entertain the appeal, *id.*, at 565–568, the Court's analysis of the policy of strict necessity provided "compelling reasons for not exercising" its mandatory appellate jurisdiction. *Id.*, at 568. Those reasons were the "highly abstract form" in which the constitutional issues were presented, *id.*, at 575–580, the "ambiguous" character of the California court's construction of the Los Angeles Municipal Code, *id.*, at 581–584, and a belief that further proceedings in the state court would ultimately tender "the underlying constitutional issues in clean-cut and concrete form." *Id.*, at 584.

In this case our analysis of the question whether the federal constitutional issues may be affected by additional proceedings in the state courts—and therefore take the case out of the first category of final judgments described in *Cox*—is similarly affected by ambiguities in the record, both as to the character of the petitioners' prima facie case and as to the character of the respondents' justification for their program.

Petitioners contend that the program was designed to give minority employees specific proportions of the available jobs in the Corrections Department. The trial court found that respondents "have discriminated and are continuing to discriminate by reason of sex and by reason of ethnic back-

---

of enforcement; withal in the paramount importance of constitutional adjudication in our system.

"All these considerations and perhaps others, transcending specific procedures, have united to form and sustain the policy. Its execution has involved a continuous choice between the obvious advantages it produces for the functioning of government in all its coordinate parts and the very real disadvantages, for the assurance of rights, which deferring decision very often entails. On the other hand it is not altogether speculative that a contrary policy, of accelerated decision, might do equal or greater harm for the security of private rights, without attaining any of· the benefits of tolerance and harmony for the functioning of the various authorities in our scheme. For premature and relatively abstract decision, which such a policy would be most likely to promote, have their part too in rendering rights uncertain and insecure." 331 U. S., at 570–572 (footnote omitted).

ground in hiring and promotion of employees in the Department." [31] Although that finding also recited that the discrimination was "motivated at least in part" by the affirmative-action plan, it did not indicate the extent to which such discrimination had occurred. Because the trial court interpreted the relevant constitutional law absolutely to prohibit any such discrimination in hiring or promotion, the court did not need to make any more specific finding. Several assumptions would therefore be consistent with the general finding of discrimination. One could assume either that all hiring and promotion decisions have been affected by the goal of achieving certain percentage quotas as to race and sex, or that race or sex has been a factor in only certain specific decisions. Included in the latter assumption are the two possibilities that race or sex was a factor in a fairly large number of random decisions, or that race or sex was a motivating factor only in connection with certain types of jobs with respect to which the Superior Court expressly permitted transfers or job assignments motivated by either the race or sex of the employee.[32] In sum, the Superior Court's findings do not go beyond a determination that there was some discrimination in hiring and promotion.

If we accept the Court of Appeal's interpretation of the record, we must assume that the respondents have used race as a factor in making promotion decisions but not in making hiring decisions.[33] Like the findings of the Superior Court,

---

[31] Finding No. 8, App. to Pet. for Cert. F-4.

[32] A third possibility is that a certain number of positions were "set aside" for particular ethnic groups or for females. Although the Court of Appeal decision seems to indicate that the Department did not establish such "controlling preferences," and that no evidence of any quota or percentage of positions set aside was introduced at trial, it is not entirely clear that the trial court would be foreclosed from making such a finding, nor is it entirely clear what the evidence at the first trial showed on this point. See n. 23, *supra;* n. 37, *infra;* Brief for Petitioners 5-9.

[33] The Court of Appeal opinion states that the evidence did not indicate that the Department employed "preferences" in hiring. See n. 20, *supra.*

however, the opinion of the Court of Appeal does not indicate whether race was considered relevant for *all* promotions or just in connection with promotions to particular positions. The fact that the Court of Appeal relied on the finding that race was a relevant factor in making certain job assignments to justify the use of race or sex in connection with promotions implies that the court thought race or sex had been a factor only in making promotions to a limited number of positions.[34] But the court did not so state expressly and it did not identify any specific position to which promotions or transfers motivated by race or sex had been made.

Thus on the one hand, if the first interpretation of the opinion is correct, and race was relevant only in making certain specific decisions, then adequate review of a narrow holding of that kind would require a more detailed identification of the particular positions involved than is now contained in findings that were prepared by the trial judge to support a quite different disposition of the case. On the other hand, if the Court of Appeal concluded that respondents had followed a general policy of using race as a factor in making promotions, and that such a policy was justified by the State's interest in a safe and efficient prison system, adequate review of a broad holding of that kind would require an understanding of how such a sweeping policy was implemented and why such a policy should be applied in the pro-

It may be that preferences similar to the ones applied in the promotion context were used in the hiring context, but the Court of Appeal did not so conclude because petitioners failed in their proof of this issue. Thus although we must assume for purposes of this opinion that race and sex were not a factor in hiring, petitioners might be able to demonstrate the contrary on retrial. See n. 37, *infra.*

[34] Because the trial court had found, in finding No. 19, that consideration of race in making job assignments or transfers to certain specific positions may serve a compelling state interest, the Court of Appeal may have assumed that promotions motivated by race or sex took place only with respect to jobs to which racially motivated transfers would have been permissible.

motion context and not in the hiring context.[35] The trial court's findings contain no such explanation because the trial court did not find that respondents had engaged in any such bifurcated policy.[36]

An additional uncertainty concerning the precise issue to be decided is that the Court of Appeal expressed doubt concerning the trial court's jurisdiction over any claims asserted by CCOA and noted that petitioners Minnick and Darden were not entitled to damages or injunctive relief as individuals. 95 Cal. App. 3d, at 526, 157 Cal. Rptr., at 272. Because the trial court's denial of petitioners' motion to certify the case as a class action was predicated on a stipulation that the court had jurisdiction to grant declaratory relief without any such certification, and because the Court of Appeal held that jurisdiction could not be conferred by stipulation, it is at least possible that claims on behalf of additional employees or job applicants may be asserted on remand. They, as well as the present petitioners, will have the right—even though petitioners' counsel have no such present intent—to adduce additional evidence in support of the complaint, or to amend their pleadings in the light of the developments in the law that have occurred since the original complaint was filed.[37] Moreover, whether or not additional evidence is

[35] Of course, if respondents did not really distinguish between hiring and promotion, then petitioners will need another opportunity to demonstrate respondents' unified policy.

[36] The text of the affirmative-action plan adopted in 1974 and revised in 1975 draws no such distinction between hiring and promotion.

[37] Under California law, an appellate court reversal of a trial court decision has the effect of vacating the judgment and returning the case to the trial court for a new trial "as if no judgment had ever been rendered." See *Erlin* v. *National Fire Ins. Co.*, 7 Cal. 2d 547, 549, 61 P. 2d 756, 757 (1936); *Salaman* v. *Bolt,* 74 Cal. App. 3d 907, 914, 141 Cal. Rptr. 841, 844 (1977). Thus the losing party on appeal may introduce additional evidence. See *Gospel Army* v. *Los Angeles,* 331 U. S. 543, 547–548, quoting *Erlin, supra,* at 549, 61 P. 2d, at 757. Although this rule regarding new

taken, the trial judge is unquestionably free to recast his findings in response to those legal developments.

Accordingly, because of significant developments in the law—and perhaps in the facts as well[38]—and because of significant ambiguities in the record concerning both the extent to which race or sex has been used as a factor in making promotions and the justification for such use, we conclude that we should not address the constitutional issues until the proceedings in the trial court are finally concluded and the state appellate courts have completed their review of the trial court record.

Accordingly, the writ of certiorari is dismissed.

*So ordered.*

JUSTICE REHNQUIST, concurring.

If I viewed this judgment of the California Court of Appeal as "final" under 28 U. S. C. § 1257, I would join the dissenting opinion of JUSTICE STEWART. Since I do not so view it, however, I join the opinion of the Court dismissing the writ of certiorari for want of jurisdiction.

JUSTICE BRENNAN, concurring in the judgment.

"In view of the ambiguities in the record as to the issues sought to be tendered," I would dismiss the writ of certiorari as improvidently granted. *Mitchell* v. *Oregon Frozen Foods Co.*, 361 U. S. 231 (1960); see *Doe* v. *Delaware*, 450 U. S. 382,

---

trials does not apply if the appellate court did not intend a new trial, *Stromer* v. *Browning*, 268 Cal. App. 2d 513, 518–519, 74 Cal. Rptr. 155, 158 (1968), such as when the appellate court decides a dispositive issue which does not turn on facts which might change on retrial, *id.*, at 519, 74 Cal. Rptr., at 160, the Court of Appeal clearly contemplated a possible retrial here.

[38] Respondents have lodged with the Court a copy of a revised affirmative-action plan adopted in 1979. Further developments as to the Department's implementation of the AAP and changes reflected in the 1979 revision might affect the question of whether the petitioners' are now entitled to injunctive relief.

386, n. 10 (1981) (BRENNAN, J., dissenting); *Cowgill v. California,* 396 U. S. 371, 371–372 (1970) (Harlan, J., concurring).

JUSTICE STEWART, dissenting.

I would not dismiss the writ of certiorari. I would, to the contrary, reverse the judgment before us because the California Court of Appeal has wrongly held that the State may consider a person's race in making promotion decisions.[1]

So far as the Constitution goes, a private person may engage in any racial discrimination he wants, cf. *Steelworkers* v. *Weber,* 443 U. S. 193, but under the Equal Protection Clause of the Fourteenth Amendment a sovereign State may never do so.[2] And it is wholly irrelevant whether the State gives a "plus" or "minus" value to a person's race, whether the discrimination occurs in a decision to hire or fire or promote, or whether the discrimination is called "affirmative action" or by some less euphemistic term.[3]

A year ago I stated my understanding of the Constitution in this respect, and I repeat now a little of what I said then:

> "The equal protection standard of the Constitution has one clear and central meaning—it absolutely prohibits invidious discrimination by government. That standard must be met by every State under the Equal Protection Clause of the Fourteenth Amendment. . . .
>
> .        .        .        .        .
>
> "Under our Constitution, the government may never act to the detriment of a person solely because of that person's race. The color of a person's skin and the country

---

[1] This ruling is "final" for purpose of the jurisdiction of this Court. See *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 482–483.

[2] It is self-evident folly to suppose that a person's race may constitutionally be taken into account, but that it must not be controlling.

[3] California's policy of racial discrimination was sought to be justified as an antidote for previous discrimination in favor of white people. But, even in this context, two wrongs do not make a right. Two wrongs simply make two wrongs.

of his origin are immutable facts that bear no relation to ability, disadvantage, moral culpability, or any other characteristics of constitutionally permissible interest to government. . . . In short, racial discrimination is by definition invidious discrimination.

"The rule cannot be any different when the persons injured . . . are not members of a racial minority. . . .

.       .       .       .       .

". . . Most importantly, by making race a relevant criterion, . . . the Government implicitly teaches the public that the apportionment of rewards and penalties can legitimately be made according to race—rather than according to merit or ability—and that people can, and perhaps should, view themselves and others in terms of their racial characteristics. . . .

"There are those who think that we need a new Constitution, and their views may someday prevail. But under the Constitution we have, one practice in which government may never engage is the practice of racism . . . ." *Fullilove* v. *Klutznick,* 448 U. S. 448, 523, 525–526, 532 (dissenting opinion) (footnote omitted).

I respectfully dissent.