NAACP, DETROIT BRANCH; The Guardians, Inc.; Brady Bruenton; Cynthia Martin; Hilton Napoleon; Sharron Randolph; Betty T. Roland; Grant Battle; Cynthia Cheatom; Evin Fobbs; John Hawkins; Helen Poelinitz, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DETROIT POLICE OFFICERS ASSOCIATION (DPOA); Thomas Schneider; President of the DPOA; City of Detroit, a Michigan Municipal Corporation; Mayor Coleman A. Young; Detroit Police Department; Board of Police Commissioners; Chief William Hart; Governor William Milliken; and the Michigan Employment Relations Commission, Defendants.

No. 80–73693–DT.

United States District Court,
E.D. Michigan, S.D.

Jan. 13, 1988.

Thomas Atkins, Brooklyn, N.Y., Barnhart and Mirer by Jeanne Mirer, Gary Benjamin, James W. McGinnis, Detroit, Mich., for plaintiffs.

Walter S. Nussbaum, Farmington Hills, Mich., for defendants Detroit Police Officers Ass'n, David Schneider, President of DPOA.

Frank W. Jackson, Asst. Corp. Counsel, Detroit, Mich., Daniel B. Edelman, Washington, D.C., Terri L. Hayles, Asst. Corp. Counsel, Detroit, Mich., for defendants City of Detroit, Mayor Coleman A. Young, Detroit Police Dept., Bd. of Police Com'rs, Chief William Hart.

## OPINION

GILMORE, District Judge.

This matter is before the Court upon remand from the Court of Appeals.[1] Before the Court are two motions: defendant City of Detroit's (City) motion for entry of judgment, and DPOA's motion for summary judgment concerning the 42 U.S.C. §§ 1981 and 1983 claims.

For the reasons set forth below, the Court will deny both motions, except for the section 1983 claim against the DPOA. This leaves the Court with the much more difficult question of whether the entire matter is moot. A discussion of that issue is found in part IV of this opinion.

The issue for determination in the City's motion for entry of judgment is whether the Sixth Circuit's mandate forbids any re-trial of liability issues and requires the entry of judgment for the City.

With reference to the DPOA, the Sixth Circuit reversed the judgment of this Court finding a breach of the duty of fair representation and remanded it to this Court to address the 42 U.S.C. § 1981 claim. The issue here is whether this Court is foreclosed from considering the section 1981 claim in light of its findings on the breach of the duty of fair representation. The DPOA also seeks summary judgment on the 42 U.S.C. § 1983 claim not addressed by this Court or the Sixth Circuit. The Court grants this summary judgment because the actions of the DPOA do not constitute state action.

### I

The Court must first consider what authority it has to act under the opinion and mandate of the Sixth Circuit. This requires a consideration of the doctrine of the "law of the case." Under that doctrine, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation. Like stare decisis, it serves the dual purpose of: (1) protecting against the re-litigation of settled issues; and (2) assuring the obedience of inferior courts to the decision of superior courts. After the law of the case is determined by a superior court, the inferior court lacks authority to depart from it. See 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.404(1), at 118 (2d ed. 1984) (hereinafter Moore's).

According to Moore's, the decision of an appellate court on an issue of law becomes the law of the case on remand. "The district court owes obedience to the mandate of the supreme court or the court of appeals, and must carry it into effect according to its terms." Id. ¶ 0.404(10), at 170 (citing In re Sanford Fork & Tool Co., 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895)).

What remains within the power of the district court after remand depends upon the scope of the mandate. When further proceedings are specified in the mandate, the district court is limited to holding such as directed:

When the remand is general, however, the district court is free to decide anything not foreclosed by the mandate.

. . . . .

[1] This Court's original opinion is found at 591 F.Supp. 1194 (E.D.Mich.1984), and the Court of Appeals' opinion is found at 821 F.2d 328 (6th Cir.1987).

In the case of a remand for further proceedings, the mandate constitutes the law of the case only on such issues of law as were actually considered and decided by the appellate court, or necessarily inferred by the disposition on appeal. In the course of subsequent proceedings directed or permitted by the mandate, the district court otherwise will apply the law as it reads it, subject to correction on a second appeal.

*Id.* at 172–74.

Courts have also held that, upon remand, a trial court may consider "those issues not expressly or implicitly disposed of by the appellate decision." *See, e.g., Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 950 (3d Cir.1985). *See also Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979).

"A trial court is thereby free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision. *Id.*" Moreover, "[t]he mere fact that it could have been decided [by the appeals court] is not sufficient to foreclose the issue on remand." *Maggard v. O'Connell,* 703 F.2d 1284, 1289 (D.C.Cir.1983).

A general rule has been provided by the Third Circuit in *Bankers Trust, supra:*

[U]pon a reversal and remand for further consistent proceedings, the case goes back to the trial court and there stands for a new determination of the issues presented as though they had not been determined before, pursuant to the principles of law enunciated in the appellate opinion, which must be taken as the law of the case.

761 F.2d at 950 (citing *United States v. Iriarte,* 166 F.2d 800, 803 (1st Cir.), *cert. denied,* 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948)).

It therefore becomes essential to consider what was actually considered and disposed of by the Sixth Circuit, or necessarily to be inferred from the disposition.

## II

The Sixth Circuit stated that in *Bratton v. City of Detroit,* 704 F.2d 878 (6th Cir.) (*Bratton I*), *modified,* 712 F.2d 222 (6th Cir.1983), (*Bratton II*), *aff'g Baker v. City of Detroit,* 504 F.Supp. 841 (E.D.Mich. 1980), *modifying* 483 F.Supp. 930 (E.D. Mich.1979), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984), it upheld a voluntary affirmative action plan providing for the promotion of a black sergeant to every second job opening for lieutenant in the Detroit Police Department. The court noted that, although it held that the factual and legal basis for the promotional plan was sufficient to justify the City in adopting the plan voluntarily, it "specifically and expressly reversed the District Court order which made the plan mandatory." *NAACP v. DPOA,* 821 F.2d at 330 (citing *Bratton II,* 712 F.2d at 223).

The Sixth Circuit noted that this Court, in applying the doctrine of collateral estoppel, held that the *Bratton* decision foreclosed further litigation on the issue of prior discrimination in the police department, and "leads to the conclusion that the City could not lay off any police officers as part of a planned reduction in force." 821 F.2d at 330. According to the Sixth Circuit, the "net effect of [this Court's] order is to mandate that the City may not reduce the staffing and budgetary level of the police department in effect at the time of the order without prior permission of the Court." *Id.*

The Sixth Circuit held that this Court properly invoked the doctrine of collateral estoppel to preclude the City from denying the facts of prior discrimination that it had earlier demonstrated and conceded. It held, however, that "it was incorrect for the District Court to then rely upon these findings as the *sole basis* for making a very significant modification to the voluntary plan by disallowing any further layoffs until the goals of the plan are met." *Id.* at 331 (emphasis added). The court stated that in *Bratton* it merely recognized that the City's voluntary affirmative action plan, based on the City's own determination that it had discriminated in the past, was

constitutionally permissible, which is "a different issue from whether a constitutional violation has occurred which mandates a court-ordered remedy." *Id.* (citing *Bratton II*, 712 F.2d at 223; *Bratton I*, 704 F.2d at 902).

In sum, the Sixth Circuit stated that this Court erred by relying "solely on the *Bratton* findings and conclusions to set aside the reverse seniority provision of the collective bargaining agreement." *Id.* It was concerned about the impact this decision would have on future employers' decisions to set up voluntary affirmative action plans, and held that judicial approval of a voluntary affirmative action plan does not create a contract of permanent employment, or invalidate or modify a collective bargaining agreement providing for layoffs on the basis of seniority. With reference to the City, the Sixth Circuit merely stated: "[W]e reverse the district court's injunctive orders against the City and the union, and remand for further proceedings consistent with this opinion." 821 F.2d at 333.

The Sixth Circuit held that remedial orders of this Court could not be bottomed *solely* on the *Baker/Bratton* findings. Effectively, to allow the voluntary affirmative action program to become mandatory based upon the same evidence that was presented merely to deem the program constitutional would be going too far. It did *not* find, however, that no evidence of unconstitutional conduct could be presented that could support the imposition of remedial orders by this Court.

In accordance with the general rule of *Bankers Trust, supra,* upon remand a trial court may consider "those issues not expressly or implicitly disposed of by the appellate decision." The trial court must redetermine the issues "presented as though they had not been determined before, pursuant to the principles enunciated in the appellate opinion."

It should be noted that in this case plaintiffs originally brought suit against the City under the Fourteenth Amendment, the Thirteenth Amendment, 42 U.S.C. §§ 1981, 1983, and 1985(3). This Court bottomed its determination of liability on the Fourteenth Amendment, relying primarily upon *Baker/Bratton,* dismissed the section 1985(3) claim, and did not address the Thirteenth Amendment claim or the sections 1981 and 1983 claims.

It therefore appears that, upon remand based upon the *Bankers Trust* general rule, and considering the narrow and very specific basis of the Sixth Circuit for reversal—namely, this Court's reliance on *Baker/Bratton* as the sole basis for decision—if otherwise applicable and relevant, the Court can consider other claims, providing that consideration is based on something other than the findings and conclusions of *Baker/Bratton.*

It appears, however, that there is no basis for consideration of several of these claims. The Court finds no basis in the record for the Thirteenth Amendment claim and will not consider it. Nor will this Court consider the section 1981 claim because, if there is a claim under the Civil Rights Act, it is based on section 1983 in view of the fact that state action is involved here.

With reference to the Fourteenth Amendment claim, the Court concludes that, in light of *Thomas v. Shipka,* 818 F.2d 496 (6th Cir.1987), plaintiffs may not pursue a Fourteenth Amendment claim. *Thomas* held that, where a plaintiff states a constitutional claim under 42 U.S.C. § 1983, that statute is the exclusive remedy for the alleged constitutional violation, and a direct claim under the Constitution cannot also be asserted. 818 F.2d at 500, 503.

*Thomas* involved a civil rights action brought by a former employee of the municipal court against the clerk of the court. Plaintiff alleged she had been wrongfully discharged because of her political party affiliations in violation of section 1983 and the First and Fourteenth Amendments. Noting that "[T]he Supreme Court has never recognized a cause of action arising directly under the Constitution in a case where section 1983 was available as a remedy," the Court dismissed the constitutional claim. It concluded: "[I]t is unnecessary and needlessly redundant to apply a

cause of action arising directly under the constitution where Congress has already provided a statutory remedy of equal effectiveness through which the plaintiff could have vindicated her constitutional rights." *Id.* at 500.

■ It thus appears that the present case against the city must be evaluated as a section 1983 action.[2] The city, however, asserts that such an action is time-barred in light of *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

*Wilson* held that all claims under section 1983 are governed by the state limitation period applicable to personal injury actions. As applied to claims in Michigan, *Wilson* provides that sections 1981 and 1983 claims will be governed by M.C.L.A. § 600.5805(8), the three year period governing claims of general injuries to the person. *See Garland v. Shapiro,* 579 F.Supp. 858, 859 (E.D. Mich.1984). Hence, asserts the City, given that the suit began in 1980, the section 1983 action is time-barred to the extent that the claim arises from the City's pre–1967 intentional discrimination.

This Court is unwilling to recognize that the section 1983 claim is time-barred. First, assuming that *Thomas* applied and that plaintiffs can now only proceed under section 1983, this Court made specific findings of fact with regards to the City above and beyond the Court's acceptance of the *Baker/Bratton* findings.

This Court found that on December 31, 1978, blacks held 1719 of 4393 positions in the rank of police officer, or 39.1 percent, and 1946 of the total of 5630 positions in the department, or a total of 34.6 percent. "This figure represents the highest percent of blacks ever in the Detroit Police Department." 591 F.Supp. at 1197. On February 23, 1984, when this Court issued its partial summary judgment ruling, the Detroit Police Department had a total sworn personnel of 3762, of which 1007, or 26 percent, were black. It had a total of 2668 police officers, of whom 756, or 28 percent, were black. "Thus, it is clear that the net effect of the layoffs in 1979 and 1980 was to wipe out most of the affirmative action recruiting that had brought large numbers of blacks onto the police force in 1977 and 1978." *Id.*

This Court also noted the testimony of Dr. Mark Bendick, Jr., an economist who updated the statistical figures established by Allen Fechter in *Baker:*

> Dr. Bendick made a projection for 1988, and indicated that, if the Detroit Police Department had hired blacks in proportion to the labor market representation in all of the years from 1945 to 1978, the presence of black officers in 1988 would be 50.5 percent. As of 1984, blacks comprised 65 percent of the relevant labor market, and the City of Detroit is 67 percent black.

*Id.* at 1198. Furthermore, Dr. Bendick also testified that the statistical shortfalls of blacks in the Detroit Police Department over the years, up to the early 1970's, could only be explained as the result of racial discrimination. *Id.* at 1200.

"Although in 1978, the year before the layoffs involved in this case took place, 39 percent of Detroit Police Officers were black, the highest percentage ever, blacks still represented a 62.2 percent of the relevant labor market." *Id.* At the time of

---

**2.** This Court recognizes that the Supreme Court has decided cases involving affirmative action and racial discrimination under solely the Fourteenth Amendment, even though the cases theoretically could have been brought under section 1983. *See, e.g., United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (allowed Fourteenth Amendment action in case involving long-standing practice of the Alabama Department of Public Safety of excluding blacks from employment); *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2982, 61 L.Ed.2d 666 (1979) (involved racial discrimination by the Columbus Board of Education in which the Court recognized a Fourteenth Amendment cause of action); *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (Court considered Fourteenth Amendment violations due to allegedly racially discriminatory rezoning in the village of Arlington Heights). However, because the Sixth Circuit language in *Thomas* is clear, and because plaintiffs could obtain no greater relief under the Fourteenth Amendment than they could under section 1983, this Court will not consider the Fourteenth Amendment claim any further.

the 1984 decision, the "percentage of black representation in the ranks of police officers [was] 28.3 percent, and in all ranks 27.9 percent. The relevant labor market in the City of Detroit ... [was] well over 65 percent." *Id.*

The September 3 letter of Mayor Young to David Watroba (former president of DPOA) shows that "the City knew that it was under a legal mandate to continue its affirmative obligation to plaintiffs, and knew that the layoffs would have a drastic effect upon this obligation." *See* 591 F.Supp. at 1201 (quotes portion of letter).

Moreover, it was obvious from "the testimony and the exhibits that in 1979, and more particularly in 1980, the City made a politically expedient decision that it would rather face a lawsuit by black police officers than face a lawsuit by white police officers." *Id.* at 1202.

With regards to the remedy, this Court found, based on the testimony of Chief William Bracey, former Chief of Patrol of the New York City Police Department "that in addition to the usual losses sustained with the loss of employment, the class of black officers suffered injury as a direct result of the City's past racial discrimination, and its failure in 1979 and 1980 to continue to remedy this discrimination. To put it bluntly—they suffered the trauma of betrayal." *Id.* at 1204.

Numerous police officials testified concerning the impact of the layoffs to the police and the community:

> Although the presence of many black command officers, who were unaffected by the layoffs, somewhat ameliorates this problem, it is undisputed that black patrol officers are the most visible, have the most daily contacts with the community, and are most important in crime prevention and community relations. Therefore, massive reductions in the numbers of black police officers below the rank of sergeant on the street will have dramatic effects.

> .    .    .    .    .

> Thus, the City is in real danger of seeing the gains of the 1970's in terms of police-community cooperation reversed, if

the City's unconstitutional layoffs are not remedied.

> It is clear from the testimony of Mayor Young and the police experts, Bracey, Hart, Bannon, Murphy, and the exhibits, that the return of black officers to the streets of the City of Detroit is not only necessary to vindicate the constitutional rights of the black police officers, but is also an absolute necessity to restore balance to the community, and the confidence of the community in the Detroit Police Department. Their testimony was intelligent, credible and convincing, and clearly established the need for the return to the force of the black police officers.

*Id.* at 1206–07.

The City argues, however, that in this case there is no contention that the City acted with racial animus in making the 1979 and 1980 layoffs, and that this Court has specifically found that it did not. Therefore, the City asserts that discriminatory action did not occur within the limitations period. To support this contention, the City quotes the Court's opinion: "This Court does not ascribe racially discriminatory animus to Mayor Young and his administration." 591 F.Supp. at 1202. Even though this Court does not ascribe racial animus to the Mayor and his administration, the fact remains that the Mayor made a conscious choice to face a lawsuit from black officers rather than from white officers, and did effectuate layoffs that drastically reduced the minority representation of the Detroit Police Department well below the proportion of the black population of the City. This Court's earlier findings show that race was a motivating factor in the City's action to layoff black officers:

> However, it is equally obvious from the testimony and exhibits that in 1979, and more particularly in 1980, the City made a politically expedient decision that it would rather face a lawsuit by black police officers than face a lawsuit by white officers. It also decided that it would threaten layoffs of black officers as a club against the DPOA in an attempt to roll back the 1978 Act 312 arbi-

tration award, especially the retroactive pay and COLA increases ordered in that award.

It is not the function of this Court to inquire into the political wisdom of these decisions. However, the Constitution, and particularly the Fourteenth Amendment, exists precisely to insure that the individual and group rights of all individuals, especially minorities, who have been historically shut out of the political process, are protected in the political process.

The rights of the black police officers and black citizens of Detroit to a fully integrated police force were sacrificed in the 1979 and 1980 layoffs. A city does not fulfill its obligations under the Fourteenth Amendment ... by simply giving the difficult problem of redressing racial injustice in our society to the federal courts.

*Id.* at 1202 (footnote omitted).

Thus, even though the Court ascribed no racial animus to the Young administration, the facts are that sufficient findings exist indicating racial discrimination to defeat a motion for entry of judgment. We are not here on a full trial on the issue of violation of section 1983, but only on the question of whether a sufficient factual basis exists to withstand a motion for entry of an order of dismissal.

The findings of fact from this Court's prior opinion provide evidence that race was a motivating factor in the City's actions to layoff the black officers. All of these findings concern events within the statute of limitations; that is, events occurring after 1977. Therefore plaintiffs' section 1983 claim is not time-barred, and can be considered under the terms of the mandate of the Sixth Circuit. Additionally, evidence can be presented of events prior to 1977 to the extent that the earlier occurrences impact upon the post–1977 events.

It is therefore clear that the City's motion for entry of judgment must be denied.

Plaintiffs have represented they will demonstrate that "wholly apart from *Baker/Bratton* the evidence of record ... dictates a finding that the City's prior unconstitutional behavior was a continuing and proximate cause of the illegal layoffs of 1979 and 1980." Assuming that the issues in this case are not moot, plaintiffs should be given the opportunity to present this evidence.

### III

The Court of Appeals disposition with reference to the DPOA was very specific. It reversed this Court's finding that the DPOA breached its duty of fair representation, and said:

The plaintiffs also allege that the union violated 42 U.S.C. § 1981. The district court did not address this issue. Accordingly, we reverse the district court's injunctive orders against the City and the union, and remand for further proceedings consistent with this opinion.

821 F.2d at 333.

The DPOA contends that all that remains for consideration pursuant to the remand order are the sections 1981 and 1983 claims.[3] As stated in the introduction to this opinion, it is obvious that the section 1983 claim must be dismissed because there is no state action by the DPOA. Therefore, the Court needs only to address the section 1981 claim.

■ It is the position of the DPOA that, to prevail on the section 1981 claim, the plaintiff must present evidence of defendant's specific discriminatory intent because section 1981 reaches only purposeful discrimination. It argues that, because there was no finding by this Court in its original opinion of intentional discrimination by the DPOA, the Court should grant summary judgment on the section 1981 claim, and dismiss the action against the DPOA.

The Court disagrees. As pointed out by plaintiffs, it is impossible to fairly read this Court's findings concerning the DPOA's

---

**3.** The plaintiffs originally brought suit against the DPOA based upon the Thirteenth Amendment, 42 U.S.C. §§ 1981, 1983, and 1985(3), and a pendent state claim for breach of the duty of

fair representation. In its earlier opinion, this Court dismissed the section 1985(3) and the Thirteenth Amendment claims. This Court did not address the section 1983 claim.

history and conduct before, during, and after the 1979 and 1980 layoffs without concluding that the DPOA was indeed guilty of intentional discrimination. This Court made five major findings in its opinion.

It first found a history of racial hostility and indifference to the rights and needs of black officers. "Witness after witness, all black and all police officers or sergeants, testified to the discriminatory manner in which they were treated by the DPOA." 591 F.Supp. at 1213.

Second, the Court found a total absence of black representation at the leadership levels of the DPOA. As of the time of this Court's opinion in 1984, no black had ever been elected to one of the top officer positions, only two blacks had served on the executive board, and no black member had ever served on the negotiating committee. This Court specifically rejected the DPOA's reason for not putting blacks on this committee, namely that there were not sufficient "trustworthy" blacks to fill the positions using the union's criteria of political patronage. 591 F.Supp. at 1214.

Third, through the recitation of the negotiating history, the Court established the perfunctory behavior on the part of the DPOA when the City eliminated one-half of the blacks from the force. This Court in its earlier opinion clearly questioned why the union responded in a totally routine manner to the layoffs of one-quarter of the DPOA members at a dramatic loss of overall dues income to the union. 591 F.Supp. 1214–18.

Fourth, the Court noted the DPOA's present-day failure in 1984 to make any serious efforts to assist the black officers. It stated:

The actual fact is that the union, even in its 1983 demands, evinced no real interest in getting black laid-off police officers back to work. Again, given the DPOA's history, this Court cannot believe that this behavior would be the same if one-half of its white membership was laid off.

591 F.Supp. at 1218.

Finally, this Court noted the DPOA's history of concessions and prompt union action to avert layoffs in 1975 and 1981, when the jobs of white officers were at stake. Comparing these lay-offs with the 1979 and 1980 layoffs of the black officers, this Court noted that, in the layoffs of the white officers, the DPOA did something, whereas with the black officers it did nothing. The Court concluded by stating:

Thus, this Court is not concerned with any reasonable activity of the DPOA in collective bargaining, even certain activity which sacrifices the interests of minorities for the majority. This Court is only concerned with activity that is arbitrary, *racially discrimitory*, and not in good faith. And this Court finds that, in its representation of its black members, the DPOA's perfunctory and passive behavior in 1979 and 1980 breached the duty of fair representation.

591 F.Supp. at 1219 (emphasis added).

These findings contradict the DPOA's assertion that the Court found as a matter of fact that there had been no discrimination in the layoff negotiations.

Furthermore, this Court's findings with respect to the violation of the duty of fair representation were tantamount to a finding of intentional discrimination under 42 U.S.C. § 1981 when it awarded attorney fees and costs against the DPOA. *See NAACP v. DPOA*, 620 F.Supp. 1173 (E.D. Mich.1985), *rev'd*, 819 F.2d 1142 (6th Cir. 1987). In granting attorney fees to plaintiff's attorneys, this Court held:

The Court did not reach plaintiff's claim under § 1981 because that claim was mooted by the finding of the breach of duty of fair representation. Plaintiff's § 1981 claim and duty of fair representation claim arose out of a common nucleus of operative facts, i.e. the DPOA's action *as a whole* with regard to the 1979 and 1980 layoffs of black officers.

*Id.* at 1180 (emphasis in original).

Furthermore, this Court cannot overlook the recent Supreme Court case of *Goodman v. Lukens Steel Co.*, — U.S. —, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), decided a week after the Sixth Circuit issued its

opinion in this case. This opinion also favors denial of the DPOA's motion for summary judgment. At issue in *Lukens* were findings of racial discrimination and harassment by Lukens Steel against its black employees, and findings that the union had correspondingly failed to comply with the statutory and contractual duties to defend its black members in challenging the company's discriminatory practices. The union was found not guilty of having racial animus against blacks generally, but those acts of omissions which were racially motivated were found to violate section 1981 in much the same way as racially motivated or racially charged acts of commission:

> As we understand it, there was no suggestions below that the unions held any racial animus against or denigrated blacks generally. Rather, it was held that a collective bargaining agent could not, without violating Title VII and section 1981, follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks. The unions, in effect, categorized racial grievances as unworthy of pursuit and, while pursuing thousands of other legitimate grievances, ignored racial discrimination claims on behalf of blacks, knowing that the employer was discriminating in violation of the contract. Such conduct, the courts below concluded, intentionally discriminated against blacks for seeking a remedy for disparate treatment based on their race, and violated both Title VII and section 1981. As the district court said, "a union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under both Title VII and section 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed towards minorities." 580 F.Supp. [1114] at 1160 [ED Pa.1984].

The courts below, in our view, properly construed and applied Title VII and section 1981. Those provisions do not permit a union to refuse to file any and all grievances presented by a black person on the ground that the employer looks with disfavor on and resents such grievances. It is no less violative of these laws for a union to pursue a policy of rejecting disparate treatment grievances presented by blacks because the claims assert racial bias and would be very troublesome to process.

*Id.,* —— U.S. at ——, 107 S.Ct. at 2625, 96 L.Ed.2d at 586–87.

Because the central premise of the DPOA motion, that this Court did not find intentional discrimination by the DPOA in its earlier opinion, is erroneous, the DPOA's motion for summary judgment under section 1981 must be denied. In its earlier opinion, this Court did not rule that no intentional discrimination occurred, only that nobody previously brought a lawsuit against the DPOA, or that involved the DPOA, in which the DPOA was found guilty of intentional racial discrimination. This does not mean that the DPOA had not discriminated in the past, nor does it mean that the DPOA did not intentionally discriminate against blacks with respect to the layoff negotiations in 1979 and 1980.

It is true that the Sixth Circuit stated that this Court did not make a specific and explicit finding of intentional discrimination, but it did not state this Court did not make findings that could rise to the level of intentional discrimination. The Sixth Circuit seems to suggest that enough evidence existed to make the finding of intentional discrimination, yet it had to recognize that the Court did not make its ruling based on that explicit finding.

It is clear that abundant evidence exists in this Court's 1984 decision regarding the DPOA's intentional discrimination. Because this Court did not bottom its decision on this basis, the Sixth Circuit felt compelled to reverse. This does not mean that evidence of intentional discrimination does not exist.

For the foregoing reasons, the motion for summary judgment on section 1981 will be denied, and the motion on section 1983 will be granted.

## IV

This Court thus finds that the City's motion to dismiss the section 1983 claim and the DPOA's motion for summary judgment on the section 1981 claim are without merit. Nevertheless, the Court must consider a more serious question—that of mootness. Defendants have represented to the Court that the remedies ordered in its prior judgment against the City of Detroit have been complied with in that the City has recalled all of the discharged black police officers, and has hired additional black officers to the Detroit Police Department. With reference to the DPOA, defendants have represented that a majority of the membership of the DPOA is now made up of minorities and that, therefore, any order requiring minority representation at the various levels of the DPOA is moot, in that minorities, through intra-union political action, can protect themselves.

These issues are of great concern to the Court. First, there are factual issues that must be determined. The representations made to the Court by counsel do not constitute a factual determination unless there can be a stipulation of facts by all sides. Secondly, the legal import of these facts, if they are established, is also of significance. If they are established, does that preclude this Court's jurisdiction under Article III under which the Court may consider only an actual case or controversy? To resolve these issues, the Court will schedule a hearing for the purpose of establishing a factual basis, and for dealing with the legal issues involved if the facts as alleged are true.

A hearing on the factual issues as to mootness and the legal effect thereof will be held on Wednesday, February 17, 1988, at 2:00 p.m. Plaintiffs' brief shall be filed by February 1, 1988. Responsive briefs shall be filed by February 12, 1988.

An order in compliance herewith may be presented.